UNITED STATES of America, Plaintiff,

v.

LOCAL 560 (I.B.T.), Nominal
Defendant,

v.

Michael SCIARRA, Joseph
Sheridan, Defendants.

Civ. A. No. 82–689.

United States District Court,
D. New Jersey.

Sept. 14, 1988.

As Corrected Sept. 28, 1988.

---

Reitman, Parsonnet, Maisel & Duggan by Bennett D. Zurofsky, Newark, N.J., for Nominal defendant Local 560 (I.B.T.).

Weissbard & Wiewiorka by Harvey Weissbard, and Alan L. Zegas, West Orange, N.J., for defendants Michael Sciarra and Joseph Sheridan.

Walder, Sondak, Berkeley & Brogan by Justin P. Walder, Roseland, N.J., for Teamsters For Liberty, amicus curiae.

American Civil Liberties Union of New Jersey, amicus curiae by Eric Neisser, Legal Director, Newark, N.J.

Samuel A. Alito, Jr., U.S. Atty. by Jerome L. Merin, Asst. U.S. Atty., Deputy Chief, Civil Div., Robert C. Stewart, Sp. Atty. in Charge, Leopold Laufer, Sp. Atty., U.S. Dept. of Justice, Newark, N.J., George E. Wilson, Sp. Atty., U.S. Dept. of Justice, Camden, N.J., for U.S.

## OPINION

DEBEVOISE, District Judge:

## I. THE PRESENT PROCEEDINGS

With the approval of Edwin H. Stier, court-appointed Trustee of Teamsters Local 560, the United States applied to modify and extend the equitable relief embodied in the original Judgment Order of this court

by rejoining Michael Sciarra and Joseph Sheridan as party defendants and by enjoining them from further participation in the affairs of Local 560. The application was embodied in an order to show cause. Two preliminary hearings were held for the purpose of defining the issues and arranging for limited discovery. An evidentiary hearing was held during the week of August 15, 1988.

On March 9, 1982, the United States filed the complaint in this action pursuant to 18 U.S.C. sec. 1964 (the Racketeering Influenced and Corrupt Organizations Act ("RICO")). Asserting that Local 560 was being victimized by racketeering activity, the complaint sought injunctive relief against individual defendants Anthony Provenzano, Nunzio Provenzano, Thomas Andretta, Stephen Andretta and Gabriel Briguglio, as associates of the Provenzano Group, and against the then Local 560 Executive Board incumbents, Salvatore Provenzano, Joseph Sheridan, Josephine Provenzano, J.W. Dildine, Thomas Reynolds, Sr., Michael Sciarra and Stanley Jaronko.

Prior to trial, Anthony Provenzano, Nunzio Provenzano and Thomas Andretta entered into consent decrees barring them forever from participating in, or otherwise interfering with, the affairs of Local 560 or any other "labor organization" or "employee benefit plan." On February 8, 1984, after lengthy hearings, the Honorable Harold A. Ackerman issued an opinion, *United States v. Local 560, Intern. Bro. of Teamsters*, 581 F.Supp. 279 (D.N.J.1984), holding that the Provenzano Group, through racketeering activity, had dominated and exploited Local 560 for more than a quarter of a century. Judge Ackerman issued a Judgment Order on March 16, 1984, in which the court did the following: (a) enjoined Stephen Andretta and Gabriel Briguglio from having any future dealings with and from endeavoring to influence the affairs of Local 560 or any other labor organization or employee benefit plan; (b) removed from office temporarily the remaining incumbent Executive Board officials (including Sciarra and Sheridan) and (c) imposed a trusteeship upon Local 560 for such period of time as might be necessary to eliminate the racketeer influence within Local 560 and to restore democratic processes in the Union.

The Court stayed the Order pending appeal. On December 26, 1985, the Court of Appeals for the Third Circuit affirmed the judgment of the district court, 780 F.2d 267, and on May 27, 1986 the Supreme Court denied a petition for certiorari, 476 U.S. 1140, 106 S.Ct. 2247, 90 L.Ed.2d 693. On June 23, 1986, the district court lifted the stay and implemented its trusteeship. Thus there was a period of approximately two years, four and one-half months between Judge Ackerman's February 1984 opinion detailing the racketeering activity and the 1986 appointment of the trustee and ouster of the Executive Board.

At the outset of that period Sciarra and Sheridan were Executive Board members and remained in office by virtue of the stay of Judge Ackerman's order removing them. On October 29, 1984, Sciarra succeeded Salvatore Provenzano (who had been convicted of defrauding the welfare benefit fund and of receiving kickbacks) as President of Local 560. He remained in that position until superseded by the Trustee. Sheridan, who had been vice-president of Local 560, remained in that position until superseded by the Trustee. Thereafter the first trustee permitted him to remain as a business agent until approximately February of 1987.

Judge Ackerman had found that the Executive Board (which, of course, included Sciarra and Sheridan) had aided and abetted the Provenzano Group of racketeers in extorting the rights of Local 560's members. In particular the Executive Board defendants aided the Group's extortionate conduct by (i) making certain appointments and reappointments to union offices; (ii) failing to remove certain appointees from office; (iii) spending union assets for Anthony Provenzano; (iv) permitting access to Local 560's offices by known or reputed criminals; (v) being recklessly indifferent to this kind of systematic misconduct of fellow incumbent officers. On appeal from these findings the Court of Appeals stated:

"... in our view, the evidence of Local 560's history of appointments of individuals with criminal convictions to positions of responsibility within the union, not to mention the expenditure of union funds for the personal benefit of Anthony Provenzano, more than adequately support the district court's finding [that the Executive Board aided the Provenzano Group in extorting the membership's rights]."

780 F.2d at 284.

It is now the position of the United States that even after issuance of the 1984 opinion and on into the period of the trusteeship, the Provenzano Group continued to dominate Local 560, and that Sciarra, Sheridan and other adherents of the Provenzano Group continued to protect, perpetuate and promote this state of affairs for the benefit of and in collusion with remnants of the Provenzano Group and members of the Genovese Crime Family—all in violation of 18 U.S.C. secs. 1951, 1962(b) and (d) and 2. It is to avoid perpetuation of the conditions this lawsuit and the trusteeship were designed to eradicate that the United States asks that Sciarra and Sheridan be enjoined from further participation in the affairs of Local 560.

In major part the application relies upon facts already established during the original hearings and set forth in Judge Ackerman's opinion. In addition, the United States has offered evidence designed to establish the facts upon which it relies which occurred after the close of the original hearings. Below I shall first summarize certain of the pertinent findings of Judge Ackerman. Then I shall set forth my own findings based on the new evidence.

## II. PERTINENT FINDINGS OF JUDGE ACKERMAN

An over-all characterization of Judge Ackerman's findings is set forth in two opening paragraphs of his opinion (the "1984 Opinion"):

It is not a pretty story. Beneath the relatively sterile language of a dry legal opinion is a harrowing tale of how evil men, sponsored by and part of organized criminal elements, infiltrated and ultimately captured Local 560 of the International Brotherhood of Teamsters, one of the largest local unions in the largest union in this country.

This group of gangsters, aided and abetted by their relatives and sycophants, engaged in a multifaceted orgy of criminal activity. For those that enthusiastically followed these arrogant mobsters in their morally debased activity there were material rewards. For those who accepted the side benefits of this perverted interpretation of business unionism ... there was presumably the rationalization of "I've got mine, why shouldn't he get his." For those who attempted to fight, the message was clear. Murder and other forms of intimidation would be utilized to insure silence. To get along, one had to go along, or else.

581 F.Supp. at 282.

Findings about the defendants are set forth at pages 299–303 of the 1984 Opinion. While in their totality these findings are relevant to the present application, they need only be summarized here.

Local 560 had approximately 10,000 members as of May, 1982. These members were employed by approximately 425 companies in the New Jersey–New York area.

Under its constitution seven elective officers are charged with managing the day to day affairs of Local 560, namely, a president, a vice president, a recording secretary, a secretary-treasurer and three trustees. The persons holding these offices constitute the Executive Board.

The Trucking Employees of North Jersey Welfare Fund, Inc. (the "TENJ Fund") and its Pension Account are located in Local 560's building in Union City. Two other employee benefit plan entities were merged into the TENJ Fund in May, 1977. These were formerly known as the Trucking Employees of Passaic and Bergen Counties Welfare Fund and the Trucking Employees of Passaic and Bergen Counties Pension Fund. These Funds are controlled by a governing body composed of four trustees

appointed by the Local 560 Executive Board and four trustees appointed by two employer associations whose member companies have collective bargaining agreements with Local 560.

The 1984 Opinion describes in considerable detail the twelve individual defendants. Five of them were members of the Provenzano Group which, through racketeering activity, had dominated and exploited Local 560. The rest of the defendants were members of the Local 560 Executive Board which had aided and abetted the Provenzano Group in extorting the rights of Local 560's members. In particular Sheridan had been vice president of Local 560 since July, 1981. Prior to that time he had been a business agent between July, 1976 and September, 1978, and thereafter a trustee between September, 1978 and July, 1981. Sciarra had been a trustee since May 28, 1981. Prior to that he was a Local 560 business agent between July 7, 1972 and September 30, 1976 and again between December of 1977 and May 18, 1981.

To reiterate, the two categories of individual defendants were as follows:

*Provenzano Group*
Anthony Provenzano
Nunzio Provenzano
Thomas Andretta
Stephen Andretta
Gabriel Briguglio
*Executive Board Incumbents*
Salvatore (Sam) Provenzano
Joseph Sheridan
Josephine Provenzano
J.W. Dildine
Thomas Reynolds, Sr.
Michael Sciarra
Stanley Jaronko

Each of the five members of the Provenzano Group had been convicted of one or more serious crimes for which he was then serving or had served extended prison sentences. The crimes, which were mostly labor related, and the sentences, are set forth in the 1984 Opinion. The Opinion also sets forth, 581 F.Supp. at 291–92, the crimes of seven other individuals who were associated with the Provenzano Group and

who participated in the victimization of Local 560 and its members—Robert A. Luizzi Salvatore Briguglio, Armand Faugno, Ralph Michael Picardo, Ralph Pellecchia, Frederick Salvatore Furino and Salvatore Sinno.

As detailed in the 1984 Opinion, 581 F.Supp. at 303–06, the Provenzano Group was organized by Anthony Provenzano in the late 1940's. It was a part of the New York organized crime family which was headed at the time by Mike Miranda, who was serving as the acting boss while its former head, Vito Genovese, was imprisoned. Anthony Provenzano was a mademember of the Genovese organized crime family. As such he and his associates were authorized to and did engage in a number of criminal activities such as gambling, extortion and trafficking in stolen property. The Provenzano Group, despite occasional imprisonment and other temporary or permanent losses of its members, continued its activities until the time of the original hearings in this case and, as will be seen, thereafter.

For the purposes of this case, the most significant project of the Provenzano Group was its conducting of a pattern of criminal and other improper acts, the object of which was to gain control over and to exploit Local 560. The details of this activity, which commenced in about 1952, are set forth in the 1984 Opinion, at 581 F.Supp. at 306–317.

A summary of some of the criminal activity of the Provenzano Group, much of which was related to its domination, exploitation and intimidation of Local 560 and its members, is as follows:

(1) 1940's: Organized truck hijackings and thefts involving Anthony Provenzano and others.

(2) 1950's: The operation of an illegal gambling business in Hudson County, financed by Anthony Provenzano and conducted by Salvatore Sinno and others.

(3) 1952–59: Dorn labor peace payoffs extorted by Anthony Provenzano.

(4) 1960: False voter registration and manipulation of the Local 560 election by

Anthony Provenzano, Salvatore Sinno and others.

(5) 1961: The murder of Local 560 Secretary–Treasurer Anthony Castellitto in Ulster County, New York, by Salvatore Briguglio, Harold "K.O." Konigsberg, Salvatore Sinno and another, at the behest of Anthony Provenzano.

(6) 1961: The Braun Company labor peace payoff demand by Salvatore Briguglio, Nunzio Provenzano and another in New York City.

(7) 1962–66, 1969–76: Payment of nearly $200,000 in Local 560 assets as "salary increases" to Anthony Provenzano, as facilitated by Stephen Andretta and Michael Sciarra.

(8) 1967: Middlesex County loansharking transaction involving Thomas Andretta and Armand Faugno.

(9) 1968: Skil Tool theft involving Thomas Andretta and Frederick Salvatore Furino.

(10) 1971: Counterfeiting conspiracy involving Salvatore Briguglio, Thomas Andretta, Armand Faugno and others.

(11) 1974: Woodstock Hotel kickback conspiracy involving Anthony Provenzano and others.

(12) 1974–77: Romano loan kickbacks to Anthony Provenzano, as facilitated by Salvatore Briguglio and Stephen Andretta.

(13) 1969–77: Seatrain labor peace payoff scheme involving Anthony Provenzano, Salvatore Briguglio, Stephen Andretta, Thomas Andretta, Gabriel Briguglio, Armand Faugno, Ralph Pellecchia and Ralph Michael Picardo.

(14) 1971–1980: City-man labor peace payoff scheme involving Nunzio Provenzano, Irving Cotler and others.

(15) 1979–81: Payment of some $86,000 in Local 560 assets as a "half salary pension" to Anthony Provenzano, as facilitated by Nunzio Provenzano, Michael Sciarra, Stanley Jaronko, and other members of the Executive Board.

(16) 1961–present: Extortion of the Local 560 members' federally protected (LMRDA) rights to union democracy—in that various associates of the Provenzano Group systematically generated and maintained within Local 560 a pervasive and compelling climate of intimidation, as a result of which Local 560 became a captive labor organization.

A climate of intimidation developed after the 1961 disappearance of Provenzano's political rival Anthony Castellitto and after the 1963 murder of Local 560 dissident Walter Glockner the morning after he expressed opposition to the appointment of J.W. Dildine as a business agent during a Local 560 meeting and, following the meeting, became involved in a heated argument with Thomas Reynolds.

Contributing to the climate of intimidation was the Provenzano Executive Board's appointment and reappointment of known criminals and convicted labor racketeers to positions of power within the Local. These appointments included: (i) Salvatore Briguglio as a business agent in 1961 just after he had participated in the murder of Castellitto; as a business agent in 1969 following his release from prison in the Braun case; as a Fund trustee in 1972; as a business agent again in 1974 just after his release from prison in the counterfeiting case. (ii) Robert Luizzi as a business agent in 1964; as a trustee in 1967; as a Fund trustee in 1974; and as a business agent in 1981, all in spite of his criminal record. (iii) Thomas Reynolds as a business agent in 1970; as a Fund trustee in 1975; and as a trustee in 1977, all in spite of his criminal record. (iv) Nunzio Provenzano as a business agent in 1963, following his conviction in the Braun case; as a clerk in 1969 following his release from prison; as a Fund trustee in 1970; as secretary-treasurer in 1973; and as president in 1975. (v) Anthony Provenzano as secretary-treasurer in 1975, following his release from prison in the Dorn extortion.

Further, known or reputed criminals such as Thomas Andretta and Armand Faugno were permitted to frequent the Local 560 offices.

Thus, Judge Ackerman found that the Provenzano Group achieved its objective of establishing total control over Local 560 and that by force and intimidation the

Group totally extinguished the rights of the Local's members to democratic control of their own union, its policies, officers and funds. As he stated:

Local 560 has been, since 1962, and continues to be a captive labor organization, which the Provenzano Group has dominated through fear and intimidation and has exploited through fraud and corruption. The Provenzano Group has used its control over Local 560 to victimize both individual members of the Local and segments of the trucking industry. This victimization has taken the form of multiple violations of 18 U.S.C. sec. 1962, and these violations are likely to reoccur as long as Local 560 remains a captive labor organization.

581 F.Supp. at 319. The fact that the Provenzano Group's membership may be depleted by imprisonment does not prevent nominees or new recruits from carrying on the work of the Group.

Of particular significance in the present proceedings are the 1984 Opinion's findings relating to the Executive Board in general and Sheridan and Sciarra in particular.

As noted above, Sheridan was vice president of Local 560 from July 1981 until replaced by the Trustee in June 1986. Prior to that time he had been a business agent from July 1972 to September, 1978 and a trustee from September 1978 until July 1981, when he became vice president. According to the 1984 Opinion, 581 F.Supp. at 299:

Sheridan presented a picture of an individual whose family had taken an active role in the union in the pre-Provenzano period and who inherited the mantle ... [H]e appeared ... to feel very comfortable with his earnings of $995 per week. He is not a boat rocker."

Testifying at the original hearing, Sheridan stated that he did not believe the allegations about Nunzio Provenzano and would be glad to welcome him back as trustee and vice president. Despite Antho-ny Provenzano's various convictions, including the conviction for ordering the murder of Castellitto, Sheridan had only the highest respect and admiration for him. He could not believe that organized criminal elements had anything to do with Local 560.

Michael Sciarra was appointed a Local 560 business agent in July of 1972, holding that position until 1976. He was reappointed in 1977 and became a trustee in 1981. He testified at the original hearings that Anthony Provenzano is his idol, and that he would welcome back Anthony and Nunzio Provenzano and Stephen Andretta even if the charges against them were true. Even if it were true that Anthony Provenzano had ordered the murder of Castellitto, Sciarra testified that he would pray for his return.

The findings concerning the entire Executive Board applied fully to Sheridan and Sciarra. Judge Ackerman found that both the Provenzano Group and the Executive Board had extorted the rights of Local 560's members and that the acts of extortion came within sec. 1962(b) of RICO. The Executive Board had aided and abetted the extortionate acts of (1) making certain appointments and reappointments to union offices as described above; (2) failing to remove certain appointees from office; (3) spending union assets for Anthony Provenzano; (4) permitting access to Local 560's offices by known or reputed criminals; and (5) being recklessly indifferent to the systematic misconduct of fellow incumbent officers.[1]

Faced with an Executive Board that was aiding and abetting the Provenzano Group, the 1984 Opinion concluded, among other things, that:

The current Executive Board members must be removed as a predicate to the restoration of union democracy within Local 560 and to ameliorate and remedy the conditions which have enabled the

---

1. As stated in RICO terms by the Third Circuit, "... the *Provenzano Group defendants* were found by the district court to have violated sections 1962(b), (c), and (d), having violated 1962(d) by conspiring to violate both section 1962(b) and 1962(c).... [T]he district court found that the Executive Board defendants violated sec. 1962(b), and conspired to violate sec. 1962(b), in contravention of sec. 1962(d)." 780 F.2d at 294 n. 35.

associates of the Provenzano Group to dominate and exploit the Local for the past thirty years. The evidence clearly points to the fact that the members view the leadership of the Local as a single, monolithic control organization. So long as it, or any portion of it, remains in actual control of Local 560 ... it will be very difficult to remove the sense of fear which the members now experience. This sense of fear within the Local—causing members to believe that it is not safe to protest or organize—is so overwhelming that it is not likely to correct itself in the foreseeable future.

Removal of each Executive Board member is also necessary because each one is either unwilling or unable to evaluate objectively the criminal conduct of fellow officers or business agents, or to institute prophylactic measures to ensure as much as possible that past criminal conduct will not be repeated. Moreover, the pervasive attitude of arrogance and insolence in the face of these circumstances continues to impress upon the membership that the Local's leadership at the very least condones criminal conduct. This, too, serves to perpetuate the atmosphere of intimidation and to suppress any dissent. *Id.* at 321.

The 1984 Opinion proceeds to summarize the particular factors which demonstrate that each individual Executive Board member would be likely to perpetuate domination of Local 560 by the Provenzano Group. The factors pertaining to Sheridan are set forth at page 324 of the Opinion; the facts pertaining to Sciarra are set forth at page 325 of the Opinion. I have referred to most of these factors in the foregoing summary of pertinent portions of the 1984 Opinion.

In view of these findings, the March 16, 1984 Judgment Order removed from office the entire Executive Board of Local 560 and imposed a trusteeship. The Order, of course, did not become effective until June 23, 1986, after the district court was affirmed by the Court of Appeals and after the Supreme Court denied certiorari. The next section of the opinion will deal with the events which transpired during that intervening period, when the Executive Board remained in control of Local 560, and during the initial period of the trusteeship.

## III. ADDITIONAL FINDINGS

### A. The Government's New Charges

The United States asserts in support of its application that:

Events since the Order [Opinion] of February 8, 1984 demonstrate that the Genovese Crime Family has endeavored to maintain its control over Local 560—notwithstanding this Court's efforts to end the quarter-century of racketeer-induced corruption, oppression and exploitation. Accordingly, the equitable remedy initially fashioned over four years ago should be modified in accordance with existing circumstances in order to facilitate the dual objective of eliminating racketeer influence within Local 560 and restoring union democracy therein.

Application for Additional Relief, at p. 2.

The United States goes on to assert that:

Throughout the post-trial period from approximately mid–May of 1983 well into the period of the Trusteeship, although progressively diminishing since shortly before February 14, 1988, Local 560 continued to be a captive labor organization —dominated by the (previously adjudicated) extortionate climate of intimidation which a quarter-century of impacted racketeering activity had instilled within its membership and which defendants Michael Sciarra, Joseph Sheridan and other adherents to the Provenzano Regime did thereafter protect, perpetuate and promote for the benefit of and in collusion with remnants of the Provenzano Crime Group and members of the Genovese Crime Family—all in violation of 18 U.S.C. secs. 1951, 1962(b) and (d) and 2.

Application for Additional Relief, at p. 10.

Certain persons and entities are involved in the government's new charges. Matthew ("Matty-the-Horse") Ianniello is alleged to be a made-member and a caporegime (i.e., a mid-level supervisor) in the

Genovese Crime Family, and as such to have exercised supervisory authority over the activities of Anthony Provenzano, Nunzio Provenzano, Stephen Andretta and other associates of the Provenzano Group who served as officials within and exercised control over the affairs of Local 560.

Thomas S. DiBiasi, Esq., a member of the New Jersey bar since 1972, was indicted on August 14, 1979, in the United States District Court for this district on charges that he committed a multi-million dollar bank fraud. On November 18, 1980, he pled guilty to a reduced charge and was sentenced to probation. He was suspended from the practice of law for three months during mid–1986. During much of the period pertinent to this action he was a partner in an Essex County law firm which conducted its business under the names of Citrino, Balsam & DiBiasi; Citrino, Balsam, DiBiasi & Katchen, and Citrino, DiBiasi & Katchen.

New England Motor Freight, Inc. ("NEMF") transports commodities between points within and without New Jersey. Since approximately 1977 Myron Shevell has been a stockholder in and chief executive officer of NEMF. Prior to early 1982, Henry Slyboom (now deceased) was the Local 560 business agent assigned to NEMF. Thereafter that position was held first by Daniel Rubino and then by Peter Granello.

The government sets forth specific charges to supports its claim that Sciarra and Sheridan have acted to perpetuate the old order:

### 1. Knowledge

As of February 8, 1984 Sciarra and Sheridan knew, by virtue of having participated in the original hearing, that each member of the Executive Board, including themselves, had been adjudged to have aided, abetted and conspired to extort the rights of Local 560's members in the specific manner described in the foregoing section of this opinion. The findings of the district court imposed an obligation upon each member of the Executive Board to take constant, drastic action to undo the effects of the racketeering conduct and to prevent future conduct of that nature.

### 2. Maintenance of Crime Family Control

The government charges that Sciarra and Sheridan participated in a scheme to maintain the Genovese Crime Family control of Local 560 until and after the trusteeship commenced. On October 29, 1984 the Local 560 Executive Board, composed of the original Executive Board defendants in this case (except for Salvatore Provenzano, who had been forced to resign in the wake of a fraud conviction), appointed Sciarra to succeed Salvatore Provenzano as president—a position which theretofore had been occupied by one of the three Provenzano brothers continuously since 1958. The government charges that Matthew Ianniello designated Sciarra to represent the Genovese Crime Family's interests in the Local 560 Board and that he discussed this with defendant Board member Stanley Jaronko on November 1, 1984 and with defendant Provenzano Group member Stephen Andretta on November 6, 1984.

### 3. Continuing Conspiracy

Thus from October 29, 1984 until June 23, 1986 Sciarra and Sheridan were, respectively, president and vice-president of Local 560. Each, along with the rest of the Executive Board, had been found to have aided and abetted the Provenzano-induced racketeering conspiracy. The government charges that in spite of these well-documented findings, neither Sciarra nor Sheridan made the slightest effort to renounce participation in the conspiracy nor to do anything to dispel the extortionate climate of intimidation which had enveloped the Local for 25 years.

### 4. Failure to Control Conspiracy Members

The government charges that Sciarra and Sheridan failed to act against the officials of the Provenzano regime who had been found to have committed specific acts in furtherance of the racketeering scheme. Josephine Provenzano remained on the Board notwithstanding the imprisonment of her father Anthony and her two uncles, Nunzio and Salvatore. Marvin Zalk, who had been part of the Provenzano Group's

infrastructure for decades, had been guilty of benefit fund improprieties on several occasions in the past. On December 21, 1983 Zalk was convicted by a federal jury of obstruction of justice in connection with the Dental Plan Case *(United States v. Marcus), et al.,* Cr. 83–104 (D.N.J.), yet Sciarra and Sheridan did nothing to dismiss or suspend Zalk, waiting for his removal by operation of law.

Defendant Executive Board member Stanley Jaronko assaulted August Muller on March 23, 1983 when, at an employees' meeting, Muller challenged Jaronko about statements Salvatore Provenzano had made, reminding Muller of the murder of Walter Glockner the morning after he had voiced opposition to Local 560's leadership at a general meeting. This was one item of evidence pointing to the intimidation of Local 560's membership. Yet, according to the government, Sciarra and Sheridan did nothing to discipline Jaronko or to demonstrate to the membership that he would no longer be permitted to engage in such conduct. As a result, according to the government, 1) Jaronko engaged in extortionate "labor peace" shakedowns during the period of the Sciarra–Sheridan incumbency; 2) Jaronko conspired with Ianniello to continue to corrupt the internal affairs of Local 560 and to perpetuate Genovese Crime Family control over the union, using Sciarra as its instrument; and 3) Jaronko's continued presence served to notify the Local 560 membership that nothing had changed and that corruption, intimidation and Provenzano control continued notwithstanding the findings and proposed remedy of the district court.

### 5. Walsh Trucking

The government charges that beginning in late 1977 and continuing until approximately the beginning of the trusteeship in June, 1986, Ianniello on behalf of the Genovese Crime Family, conspired with Anthony Provenzano, Stephen Andretta and other officials within Local 560 and with Francis J. Walsh, Jr., and others associated with him in certain trucking and warehousing corporations to effectuate a "labor peace" payoff scheme between Walsh Trucking Enterprise and various officials within Local 560 and their designees. The object of the conspiracy, according to the government, was to enrich the various conspirators at the expense of the Local 560 members who were employed by Walsh. The specifics of the government's charges are set forth in the indictment in *United States v. Walsh* (Cr. 88–114, D.N.J.).

According to the government Sheridan was the official within Local 560 who was immediately responsible for negotiating the 1978 sweetheart contract between Local 560 and Walsh Trucking and Consolidating Company and that thereafter Sciarra and/or Sheridan signed the Walsh sweetheart contracts in succeeding years—all of which aided and abetted the racketeering conspiracy. The government asserts that this all continued into the period of the post-hearing Sciarra–Sheridan administration.

The government did not seek to prove its allegations concerning the Walsh Trucking relationship with Local 560 at the preliminary injunction hearing.

### 6. Prepaid Legal Services

The government charges that between early 1979 and late 1986 Sciarra, Sheridan and others aided and abetted Di Biasi and his law firm in the commission of various offenses involving a prepaid legal services plan.

Among the specifics of the government's charges are the following:

a. Sciarra was aware that certain Local 560 members (because of prior union affiliations) were beneficiaries of a prepaid legal services plan which was funded by direct contributions from employers to the DiBiasi law firm and that utilization reports were required by the plan's documents to monitor the performance of the firm. Neither DiBiasi nor his firm ever submitted utilization reports and Sciarra never asked for such reports. The DiBiasi firm received more than one-half million dollars from employers and has never had any way to account for the use of such funds. Similarly, Sheridan, who signed many of the prepaid legal service contracts, never read the provisions, never thought to

request utilization reports and never sought to evaluate DiBiasi's fitness to provide the services.

b. In mid-1984 Sciarra, with Sheridan's and Jaronko's support, decided to provide prepaid legal services to an additional segment of the Local 560 membership who then participated in the Trucking Employees of North Jersey Welfare Fund, Inc. (the "TENJ Fund"). Although advised by counsel for the employer-trustees that there was a possible problem, on August 21, 1984 Sciarra, Sheridan and Jaronko caused the selection of the DiBiasi law firm as the exclusive service provider for the "TENJ Legal Services Fund" notwithstanding that i) DiBiasi had been charged with fraud and pled to a reduced charge; ii) eighteen months earlier DiBiasi had been sued by Columbia Savings and Loan Association for professional negligence in connection with a $2.1 million fraud allegedly committed upon the bank; iii) the employer trustees sought to obtain competitive bids for the services; iv) the DiBiasi firm did not have the capacity to provide the level of services required; and v) counsel for the employer trustees were of the opinion that DiBiasi was barred under ERISA because of his prior convictions. At the preliminary injunction hearing, the government did not seek to prove items (ii) and (iii) above.

c. During the period between the selection of the DiBiasi law firm on August 21, 1984 and the imposition of the trusteeship in June 1986 Sciarra and Sheridan permitted the continued retention of the DiBiasi law firm notwithstanding that: i) on September 7, 1984 DiBiasi asked for and received a $50,000 advance to finance expansion of his law firm's resources needed to provide the required services, promising to offset the advance against per capita contributions due to begin in October; ii) repayment of the $50,000 advance was never sought or made until the trustee was appointed and took action to recover it; iii) on January 31, 1985 the managing partner in DiBiasi's law firm, L. William Balsam, Esq., was suspended by the New Jersey Supreme Court in connection with allegations of misconduct which were being investigated by the Essex County Prosecutor's Office; iv) on April 28, 1986 Balsam committed suicide as the Prosecutor was about to file charges of embezzlement with respect to $800,000 in clients' trust funds; v) on April 15, 1985 Sciarra and Sheridan voted to give the law firm a three-year contract in place of the still unexpired one-year contract, this vote taking place two and one-half months after Balsam's suspension; vi) on May 24, 1985 the TENJ trustees voted to modify the DiBiasi's malpractice insurance requirement to a flat $3,000,000; on June 24, 1985 the law firm's malpractice insurer cancelled its policy, a fact which was concealed from the TENJ's trustees until May 6, 1986 when the law firm's counsel informed several of the plan trustees that the firm had been operating for some eight months in violation of the contract requirements; vii) thereafter, notwithstanding all that went before, Sciarra, Sheridan and Jaronko pressured the employer trustees to extend the service contrast with the DiBiasi law firm so that the firm could use the extended contract to collateralize a bank loan of $150,000 that the firm needed to resolve the financial difficulties arising out of the Balsam embezzlement. At the preliminary injunction hearing, the government did not seek to prove item iv) above or that pressure was exerted against the employer trustees to extend the service contract.

### 7. New England Motor Freight Sweetheart Arrangements

The government charges that throughout the period between late 1975 and mid-1986 Myron Shevell, on behalf of NEMF, cultivated a corrupt relationship with certain officials of Local 560—including Anthony Provenzano, Stephen Andretta, Henry Slyboom, Daniel Rubino and Peter Granello—as a result of which NEMF obtained sweetheart benefits from Local 560 throughout the years in question and was eventually able to deunionize its operations altogether. The government claims that Ianniello and Stephen Andretta conspired with Shevell to interfere with the affairs of Local 560 by causing Sciarra to sabotage grievance actions against NEMF which ran counter to the interests of NEMF and jeopardized its

sweetheart status. One result of this intervention, according to the government, was Sciarra's January 31, 1985 offer to NEMF of a collective bargaining agreement which in effect would have removed the entire NEMF workforce other than three warehousemen from Local 560 jurisdiction. NEMF did not accept this offer. On February 20, 1985 Local 560 business agent Daniel Rubino testified before the Joint Local Committee with respect to the NEMF grievance. In doing so, the government alleges, he contradicted his prior sworn statements concerning the nature and extent of past practices of NEMF. The testimony undermined the union's position, and three months later the Teamsters grievance committee deadlocked, ending the union's attempt to end NEMF's anti-Local 560 practices. The government charges that Sciarra never acted in the face of Rubino's past sweetheart deals with NEMF or in the face of his change of position before the grievance committee.

### 8. Sciarra's and Sheridan's Mind–Set

The final ground which the government advances to support its application are the asserted attitudes of Sciarra and Sheridan towards their responsibilities as officers and trustees of Local 560 in face of the devastating disclosures made during the course of the original hearing and in face of untoward events which have occurred since that hearing was concluded. Both men were, of course, found to have aided and abetted the racketeering activities which produced the situation described in the 1984 Opinion and since 1984 they have been the principal officers of Local 560. Yet, according to the government, they still profess to see no serious problems calling for drastic remedial actions on their part; they still consider the Local 560 problems to be the result of a government vendetta. They cannot believe that the Genovese Crime Family is a potential problem or danger to Local 560. All this, the government contends, shows that Sciarra and Sheridan are the same persons they were when they were ordered removed from office in 1984 and that their resumption of office would ensure the return of the conditions the trusteeship was designed to end.

### B. The New Evidence

#### 1. The Intercepted Conversations

Central to the government's motion to disqualify Sciarra and Sheridan are three tape recordings of conversations held in a construction shed in Edgewater, New Jersey, as supplemented by a recording of a conversation held at the Palma Boy Social Club in East Harlem. The government contends that the conversations establish that the Genovese Crime Family sought to continue its control over Local 560 after the issuance of the 1984 Opinion and that Michael Sciarra was the Family's chosen instrument to achieve this end.

The first tape (Exhs. 7 and 7A) records a conversation held on November 1, 1984 involving Milton Parness, Matthew Ianniello, Stanley Jaronko and an unidentified male. The second tape (Exhs. 8 and 8A) records a conversation held on November 6, 1984 between Ianniello and Stephen Andretta. The third tape (Exhs. 9 and 9A) records a conversation held on December 7, 1984 involving Ianniello, Andretta and an unidentified male. The fourth tape (Exhs. 57 and 57A)' records a conversation held on November 28, 1984 (at the Palma Boy Social Club) involving Anthony Salerno, Guiseppe Sabato, Cirino Salerno and Louis Gatto. It will be recalled that Salvatore Provenzano had been convicted on December 21, 1983 of embezzlement from a dental plan of the Local 560 Welfare Fund; that in October 1984 the Taft–Hartley Act had been amended to further limit the right of convicted persons to hold labor union office; that effective October 31, 1984 Saltarore was barred from continuing as president of Local 560 and of Teamsters Joint Council No. 73 (covering the New York–New Jersey area); and that in late October 1984 the members of Local 560 selected Sciarra to succeed Salvatore Provenzano as president of Local 560. All of the taped conversations took place shortly after these events.

The attorney for Sciarra and Sheridan submitted copies of the three transcripts of the conversations held in the construction shed including his corrections of the

government's transcripts. There were some portions of the tapes which he found to be unintelligible which I could hear quite distinctly. There were some portions which also to me were unintelligible. In some places he made corrections in the transcripts which were in accordance with what I heard, and when that occurred in portions which I quoted, I incorporated the corrections in the quotations. The government transcripts appear to be accurate in all substantial respects, and there is very little difficulty in understanding the essential meaning of what is said on the tapes.

The tapes must be viewed in the light of other evidence introduced at the original hearing and at the instant proceeding. Since the 1960's Anthony Provenzano and persons associated with him controlled Local 560 and subjected the Local and its members to the various abuses described above. Anthony Provenzano was President of Local 560 until his conviction and imprisonment required his removal. He was succeeded as President by his brother Nunzio who remained in office until his conviction required his removal; he in turn was succeeded by another brother, Salvatore, whose post-conviction removal occurred in October, 1984. It would appear that even while in jail at the federal penitentiary in Lompoc, California, Anthony maintained a fair degree of control over Local 560.

Although the Provenzano Group was a principal subject of the original hearing, it operated as a constituent part of the Genovese Crime Family and was subject to the direction and control of the Family's hierarchy.

In 1984, Anthony ("Fat Tony" or "Tony") Salerno was the boss of the Genovese Family. His headquarters was in Harlem. In November 1984, Vincent ("The Chin" or "Chin") Gigante was acting boss.

Beneath the boss and underboss of an organized crime family comes a consigliere (or counsel). Beneath him there are a number of caporegimes, who are very powerful men in charge of various soldiers who are made members of the family. Each soldier, along with others associated with him, conducts criminal enterprises which produce profits for himself and for those higher in the family.

Anthony Provenzano was a soldier in the Genovese Family. Among his undertakings was the control of Local 560. Among his associates, as found by Judge Ackerman, were Nunzio Provenzano, Thomas Andretta, Stephen Andretta and Gabriel Briguglio.

In 1984, Matthew Ianniello was a caporegime in the Genovese Family. The Provenzano Group was within his jurisdiction. The tape recordings, among other things, reflect his position within the Genovese Family and they reflect his and the Family's steps to remain in control of Local 560 after Salvatore Provenzano's removal as President, during the period of the trusteeship and thereafter.

The November 1, 1984 conversation was between Ianniello, Milton Parness, Stanley Jaronko and an unidentified man. Jaronko, of course, was a member of the Local 560 Executive Board and had been found by Judge Ackerman to have aided and abetted the Provenzano Group in its control and exploitation of Local 560.

The participants in the conversation discussed various union matters, not limited to Local 560, and they discussed organized crime figures who are not involved in this case. They discussed the effect of Judge Ackerman's proposed order:

> Ianniello: What about you, what are you gonna do (unintelligible)
> Jaronko: No but the fuckin' order's with Ackerman.
> Unidentified Effectively it takes you out too?
> Jaronko: It takes everybody out.
> Ianniello: What do you mean?
> Unidentified Male: Just the officers.
> Jaronko: The offices is gonna, be, we closed it.
> Ianniello: Oh yeah. You were away anyhow. (unintelligible).
> Jaronko: I'll go back into construction. I'll just lay low for eighteen months. And we'll get a new office then. We've got money ...

Thus it can be seen that Ianniello and Jaronko were discussing continued control of Local 560. Jaronko's statement that he would lay low for 18 months was significant, because 18 months was the period that it was anticipated the court-appointed trustee would replace the Executive Board.

Jaronko reported on a telephone call to Salvatore Provenzano, during which Provenzano stated that he did not want to be seen with Jaronko and his associates. Ianniello told Jaronko he had to "run the shop, or do something with the shop" (referring to Local 560) and then, "let Mike run the show." The recording concluded:

Jaronko: He knows Mikey?

Ianniello: Yeah. No ... (unintelligible).

Parness: Mikey Sciarra?

Ianniello: Yeah Mikey Sciarra. I know him.

Jaronko: You know him? Or I'll come down with him in case he's (unintelligible).

Ianniello: Any kind of message (unintelligible) it's important. Alright. Go ahead. Take care ...

The November 6, 1984 conversation was between Ianniello and Stephen Andretta. Andretta was a member of the Provenzano Group and had been enjoined from attempting to influence the affairs of Local 560. As described in the 1984 Opinion, during the years when the Dorn prosecution was pending, Sciarra and Andretta cooperated to secure membership approval of Anthony Provenzano's two "salary increases," which later became a RICO predicate in this action.

In the November 6, 1984 conversation Ianniello and Andretta discussed numerous persons in the Genovese Family and also discussed a number of past and pending criminal endeavors, many relating to Anthony Provenzano, Nunzio Provenzano, Salvatore Provenzano and/or Local 560.

There was a discussion of Michael Sciarra, apparently in part with reference to appointing him as President of Teamsters Joint Council 73, a position which also became vacant as a result of the conviction of the incumbent Salvatore Provenzano. The conversation concerning Sciarra was, in part, as follows:

Andretta: Well he was involved in the civil, in the civil thing with us.

Ianniello: Why should he get fired for that?

Andretta: Well it ... It's a test case, the civil RICO.

Ianniello: Was he found guilty ...

Andretta: (unintelligible) ... case I (unintelligible) we all got found guilty.

Ianniello: (unintelligible)

Andretta: Yeah, it's a test case where they're gonna use against any, any local in the country. But, the government didn't use it, the government has a weapon, but, they're afraid to use it. I mean, they're afraid if they move them all out of office (unintelligible). Who knows when they're gonna do it. If they're gonna do. If they can do it.

Ianniello: I think Mike Sciarra should take over there. Who can you trust there, anybody else?

Andretta: Mike and I were born and raised together.

Ianniello: You got anybody around you can trust there?

Andretta: No, at this point I don't even know who the fuck is up there.

Ianniello: Well, I've gotta give them a name, they want this guy Frank now that they want.

[The last three items were likely a reference to the Joint Council 73 Presidency, because Frank Carracino, President of Teamsters Local 575, ultimately replaced Salvatore Provenzano in that capacity.]

·    ·    ·    ·    ·

Andretta: ... I don't see Mikey at all but ah ... you know.

Ianniello: He knows that you're close with me don't he?

Andretta: Mikey?

Ianniello: Does he know you're close to me?

Andretta: Well he might. He might think I'm not.

Ianniello: Well ... I'll send word to him. I'll make sure that he knows that you

can talk to him as one. Here, they always were moving.

Andretta: (unintelligible) If ever you send me to see him its coming from you it's that right, right now he thinks I'm in a (unintelligible).

Ianniello: No, no, I'll send word to Mike (unintelligible).

Andretta: I can see Mike any time you want me to.

Ianniello: You?

Andretta: Yeah.

.    .    .    .    .

Andretta: Then when I was away there was really no way for me to get back to it. Let me just brief you on the whole thing. When I was away my kid gets fired from the job and Sammy didn't help.

Ianniello: Nobody said a word.

Andretta: My brother's kid got fired by him.

Ianniello: Nobody sent me word.

Andretta: Now I've got them all out of fuckin' work, my brother's kids, another kid's coming out of fucking jail, this one. So that's why I wanted to grab Mikey. Hey, you're talking about two jobs. That's why I wanted you to send word to my

Ianniello: I'll send word to Mikey. Anything he can do for you he'll do for me.

Andretta: Yeah.

Ianniello: Anything I can do for you. Like I told Walsh, anything you can do for me do for me.

The December 7, 1984 conversation was between Ianniello, Stephen Andretta and an unidentified male. It involved several subjects pertinent to the present application.

There were additional comments about Ianniello's and Andretta's trust in and reliance on Sciarra.

Andretta: I understand at this point. But with Mikey and then you, you have direct control of Mikey.

Ianniello: Yeah.

Andretta: No question.

Ianniello: Yeah, he does what I tell him.

.    .    .    .    .

Ianniello: You got left, (unintelligible) you'd think I would trust Mike to call the shots.

Andretta: Right.

Ianniello: (unintelligible) Period of a year, two, he don't do nothing in a year.

Andretta: Alright, I wanna ask you now, as far as Mike, if he calls the shots, I don't think Mikey's calling the right shots, I'll be honest with you. He's being influenced by (unintelligible) ... At this stage if he would just come through ...

Ianniello: These guys don't do it no more (unintelligible) Tony. I told her

Unidentified Male: I haven't seen Mikey in three weeks.

Ianniello: Oh, I told him. Two months ago I told him. Don't go there no more.

In addition the December 7, 1984 conversation included a discussion of plans to deal with the consequences of the 1984 Opinion, speculations concerning the outcome of the then pending appeal, and ideas for maintaining control of Local 560.

Andretta: You know what the RICO Act is, right? We just came out of a civil RICO. It was the first case of its kind in the country. I'm under court order now. I can't be involved with no union people, I can't discuss no fuckin' union business.

Ianniello: Yeah, but see we're legal (unintelligible)

Andretta: It's a test case. They're gonna start using it all over the country ...

Ianniello: Instead of the Court they got now. Understand now, the Circuit Court lays now so be quiet. We won't say anything.

Andretta: Right, but all the government has to do is come in and say to them you're gone. So far the government didn't chase them out. The government has that right. The government won the case. But the government hasn't chased us out for the simple reason that they never, they, it's got a tiger by the tail and they don't know how to handle it.

Ianniello: The people let these guys in.

Andretta: And there's too much work involved, the government can't handle it, too expensive for them and they don't know how to use the weapon they've got at this point. But they got the law on their side. Now they started it. Now, during the trial, it was a 5½ month trial, I was in the can

.    .    .    .    .

That's what I'm saying with Mikey and them guys. I don't think they can get out of their own fuckin' way but they're really guys up there, and aside from Mikey, I won't go fuckin' rob a cup for nobody. I don't trust nobody.

Ianniello: (unintelligible) You don't trust them (unintelligible)

Andretta: What I'm trying to say is . . .

Ianniello: If you know these guys, how could I get involved with these guys?

Andretta: Know them? I know them . . .

Ianniello: (unintelligible)

Andretta: They're friends of mine.

Ianniello: And you know what it (unintelligible) why should I get involved? Means I (unintelligible) I like your judgment.

Andretta: I'll get involved behind the scenes. The only way I'll get involved is if you tell Mikey, the only way I'll get involved (unintelligible) come tell me (unintelligible). If he sees me I ain't gonna tell him what to do. He's gotta tell me.

Ianniello: Yeah, discuss it.

Andretta: What he's doing before he does it. The reason, you want to appoint somebody, you want to do this, you want to do that and come tell me, you tell him. He says, don't bother. I can't make three nickels there. I want authority.

Ianniello: You said it. Sit back. Let's wait for about six months (unintelligible). Decision to come down soon, right?

Andretta: On what?

Ianniello: On what (unintelligible) they're coming down with a decision; they're coming down with

Unidentified Male: Up there?

Ianniello: Yeah

Unidentified Male: Yeah, I feel . . .

.    .    .    .    .    .

Ianniello: He [probably Salvatore Provenzano] wants to get the Local (unintelligible) Vice President, the President, he gonna be Joint Council, follow me?

Andretta: He didn't. He gave up.

Ianniello: I says but if he gets acquitted he's got a shot at this.

Andretta: Oh, with this case here.

Ianniello: Yeah

Andretta: After the case then what? Then we'll decide what . . .

Ianniello: Yeah, right now everything is in limbo. He's in limbo right now. Let's see what happens with the appeal. If nothing happens with the appeal, then we'll sit down.

Andretta: That's the only way he can be controlled. Mattie, I know our business.

During the December 7, 1984 conversation Ianniello and Andretta discussed another subject which is of significance in this case. They discussed the relationship between the carrier New England Motor Freight ("NEMF") and Local 560. To understand this part of the conversation it is necessary to be familiar with certain background information.

Until 1977, NEMF was a party to the pertinent Teamsters National Master Freight Agreement and subject to its terms and conditions. In 1977, Local 560's business agent Henry Slyboom agreed that NEMF would be permitted to continue certain "past practices," namely (i) the use of outside companies to supply labor to be used as an adjunct to NEMF's bargaining unit dockmen and (ii) NEMF's use of contract cartage companies. Use of contract cartage companies involved retaining owner-operator-persons who owned their own vehicles and on whose behalf NEMF was not required to make payments to the Teamsters' pension and welfare plans. Slyboom's agreement with NEMF was memorialized in an October 14, 1977 letter from NEMF's Director of Operations to Slyboom (Exh. G85).

On November 2, 1981 NEMF's President Myron P. Shevell wrote to Teamsters Local

560 notifying it that NEMF had withdrawn from the National Master Freight Agreement negotiations and would not be bound by any national contract agreed upon by the negotiators. Meanwhile Henry Slyboom died and was replaced by Local 560 business agent Daniel Rubino.

On February 5, 1982 the International Director of the Eastern Conference of Teamsters issued a directive that any tentative agreement which differs from the proposed National Master Freight Agreement and Supplements "MUST BE APPROVED by the UNION representatives of the Eastern Conference Joint Area Committee." (Exh G87).

On March 8, 1982 Shevell wrote to Local 560 announcing NEMF's willingness to comply with the economic settlement reached as a result of the National Master Freight Agreement negotiations. He added, "I also agree to extend my present contract, conditions and practices and existing terms for three (3) years to March 31, 1985." (Exh. G88; see also Exh. G89).

Without obtaining prior approval from Union representatives of the Eastern Conference Joint Area Committee Daniel Rubino accepted Shevell's offer, advising him on April 16, 1982 "that I have taken a vote with the employees of New England Motor Freight Inc. and they are in agreement with the terms and conditions that were proposed in your letter to me on March 8, 1982." (Exh. G90).

There were two practices in which NEMF engaged which were of substantial economic benefit to it, and, conversely, were to the very great detriment of Local 560's bargaining position. This can be illustrated by NEMF's employee position in 1985, which reflects the situation which developed after Henry Slyboom's 1977 and Daniel Rubino's 1982 "past practices" agreements.

As of 1985 NEMF had two general categories of workers—warehousemen and drivers. Relying on the past practice of using outside companies as an adjunct to the bargaining unit, NEMF contracted with its subsidiary or affiliate Apex to provide 40–50 warehousemen. The Apex employ-

ees were members of District 15 of the Machinists Union and their collective bargaining unit had terms and conditions much less favorable than those of the Teamsters National Master Freight Agreement. In addition to the Apex employees, NEMF hired Local 560 members as warehousemen, and as to them it was subject to the economic provisions of the National Master Freight Agreement. In 1985 NEMF had three Local 560 warehousemen in its employ.

Also relying on past practices, as of 1985 NEMF retained approximately 70 so-called "owner-operators" as drivers. While the owner-operators may have been members of a Teamsters local, they owned their own vehicles and it was not necessary for NEMF to make pension and welfare benefit contributions on their behalf. In addition to the owner-operators, NEMF had 10 of its own employees performing as drivers and on account of whom it had to meet the economic requirements of the National Master Freight Agreement. Thus as of 1985, out of NEMF's approximately 123–133 warehousemen and drivers, only 13 were a part of the Local 560 bargaining unit. This gave a significant economic advantage to NEMF (an advantage which it claimed was necessary to its survival) and it put Local 560 in a very weak bargaining position, because even if it called a strike by its 13 members there would be little impact upon NEMF.

While the foregoing statistics reflected the status of NEMF's warehousemen and drivers in 1985, the situation was generally the same in and prior to 1982 when Daniel Rubino agreed to Shevell's March 8, 1982 proposal to continue in effect the "past practices" arrangement originally entered into by Slyboom in 1977.

The situation took a sudden change in 1983. Salvatore Provenzano asserted that all NEMF warehousemen and drivers were covered by the National Master Freight Agreement and threatened to destroy NEMF if it did not accede to that position. Local 560 submitted the question to the Joint Local Committee of North Jersey. NEMF instituted an action in this court

seeking to enjoin arbitration through the grievance proceeding of the question of its use of non-bargaining unit warehousemen and drivers.

On October 24, 1983 Judge Sarokin, to whom the case had been assigned, set forth his reasons for denying NEMF's application for a preliminary injunction. He viewed the March 8, 1982 Shevell letter, as accepted by Rubino, as determinative of whether NEMF was bound to resolve its labor disputes through the Joint Local Committee mechanism of the 1979–82 National Master Freight Agreement. He accepted NEMF's position for the purpose of the application "that [Local 560] agreed that plaintiff could continue to use non-bargaining unit personnel as it had in the past" but that NEMF had failed to establish likelihood of success on the contention that the question whether non-bargaining unit persons were being used beyond the past practices exception was outside the agreed upon jurisdiction of the Joint Local Committee. Judge Sarokin did not foreclose the possibility that at a final hearing NEMF might establish that its past practices were not subject to review by the Joint Local Committee.

After Judge Sarokin's October 24, 1983 opinion and order denying preliminary injunctive relief, discovery was conducted, and the proceedings before the Joint Local Committee went forward.

That was the status of the NEMF dispute at the time of the December 7, 1984 conversation between Ianniello and Andretta. It is the government's contention that throughout the period 1975 to mid–1976 Shevell, on behalf of NEMF, cultivated a corrupt relationship with Local 560 officials, including Anthony Provenzano, Stephen Andretta, Henry Slyboom, Daniel Rubino and Peter Granello, as a result of which NEMF obtained a "sweetheart" arrangement from Local 560 throughout the years and was eventually able to deunionize its operations altogether.

The December 7, 1984 tape recorded conversation provides strong support for the government's contention.

Prior to Myron Shevell's formation of NEMF his brother Daniel had operated Eastern Freightways. One of Eastern's employees was a fourth Provenzano brother, Angelo. Eastern went into bankruptcy and thereafter Daniel Shevell committed suicide by shooting himself in the head. Afterwards Myron Shevell formed NEMF. In their conversation on December 7 Ianniello demonstrated familiarity with this background information:

Andretta: ... Alright, you remember, years ago, Tony's brother Lou, not Louis, Angelo.

Ianniello: Yeah, we formed a truck company.

Andretta: Had the truck company.

Andretta: Now this, this fellow was bumping heads with George Walters (phonetic).

Ianniello: I knew him. He retired.

Andretta: Sure, I got a job (unintelligible). This guy, Larry bought him out and he hired the guy. After years, he was like a tyrant in the company, Tony's brother. He used to use his name to abuse drivers, this and that and he got along, this guy paying a lot of money.

Ianniello: He died now.

Andretta: He died. His company went bankrupt. Then the company started up again. The company did nothing different than the other companies did.

As recited above, in 1983 Salvatore Provenzano suddenly departed from the longstanding arrangement between Local 560 and NEMF, leading to the grievance proceeding and the case before Judge Sarokin. In the taped conversation Andretta briefed Ianniello about the matter, describing this development as the result of a personal vendetta Salvatore had against Shevell. He viewed it as a violation of an ongoing understanding with NEMF. He pictured Rubino as being forced by Salvatore Provenzano to depart from his prior understanding with Shevell. He considered the lawsuit before Judge Sarokin to be dangerous to various of their associates. After listening to the report Ianniello agreed with Andretta that the pressure on Shevell

had to be stopped and that Michael Sciarra had to try to straighten out the situation:

Andretta: ... Do you know the case with this Jew? This, uh, Shevell, Mike Shevell?

Ianniello: No

Andretta: Let me first brief you on it, so you understand where—when Mikey (unintelligible) don't know what the fuck he's doing. This Mike Shevell owns a truck company....

Andretta: He [Daniel Shevell] died. His company went bankrupt. Then the company started up again. The company did nothing different than other companies did. So somehow or other, he [Myron Shevell] got into an argument with Sammy [Salvatore Provenzano] and Sammy had a vendetta with the guy. Now Sammy had an agent up in the office, by the name of Danny Rubino.

Unidentified Male: Danny Rubino.

Andretta: Danny Rubino, the ex-fighter.

Ianniello: Yeah, yeah.

Andretta: His wife [Linda Rubino] got indicted with Sammy [*United States v. Marcus*, Cr. No. 83–104]. That's the girl who was going to rat on him.

Ianniello: Oh yeah, yeah, yeah

Andretta: You aware of this?

Ianniello: Yeah, yeah, the wife, she is a rat.

Andretta: Supposedly she threatened Sammy that she was gonna squeal, she ain't gonna squeal.

.    .    .    .    .

Andretta: ... Now her husband works for this fucking company [NEMF]. He's the agent for the company. Follow me closely, he represented the trucking company. So now, Sammy sends someone else down to this company to their guy, says to him, look. Sammy started giving him union problems first (unintelligible) he says ah, so he sent a guy, another agent to talk to him says, uh, how come uh, you're having trouble with Sammy. He says look all Sammy wants you to do is tell him how much money you gave this guy over the years, and that we did with it.... So the guy says words that like a man look, first of all, who says I

did anything with Danny, and if I did I ain't gonna tell him anyway. Well (unintelligible) so he starts putting heat on this fucking guy, so much that Danny says, Danny says to this guy look, it ain't right what Sammy's doing to you. When it comes to the case, I'll testify for you for the union problem. Then Sammy says to Danny, if you testify and knock him—Danny's feuding with this guy now. Now, he tells the guy in front of witnesses, your brother blew his brains out, when I get done with you, you'll do more, worse than that to yourself.

Andretta: Sammy ain't threatening him. He says when I get done with you, you cocksucker, you won't be able to sell apples on the corner. I'll knock you right out of the fuckin' business.

Ianniello: He want took over, but I know he's talking to Pete, he don't wanna talk to nobody.

Andretta: He tells us that in front of people now. So now the guy, now the guy is gettin scared, he goes, this is while I'm away, he goes to Danny. Danny says I'm not trying to help, I'm not trying to help you. So Danny don't help him now. Cause Danny's only got a year and a half to go on his pension, so he's afraid. Sammy's got him bulled now. So Sammy grabbing Danny. So now Sammy, now Danny is out of the picture with this here guy. Now this guy has a hearing, hearing, hearing, hearing. Before you know it, Sammy threatens this guy's lawyer. He ain't gonna give his lawyer no more trucking work. He gets four companies to tell this guy they ain't gonna use his law, law firm no more.

Ianniello: He's cracking up.

Andretta: Now listen to what I'm telling you—now on top of this. So this guy says fuck it. The guy says, fine, I understand.

Ianniello: He owns a piece Sammy got, he's working for that guy.

Andretta: Now this guy is supposed to get, a hearing, so he gets the hearing. So this guy figures, one way for me to come out of here without blowing my business cause Sammy's gonna knock me

·out of the fuckin' business, right, is to put heat on Danny. Danny's got a (unintelligible) order, a Federal Judge is involved there. The same judge that sentenced Nunzie, and, Irv Cotler. (unintelligible) Sarokin. He says what's going on here, what's all this, what's all this here. Now he knows it's a fuckin' labor case. He sends, he sent the whaddayacallit him ...

Ianniello: Doesn't Sammy write his sister?

Andretta: He court, he sent the court stenographer to a fuckin' labor grievance hearing, to take the minutes of the hearing, transcripts, so the judge could, a Federal Judge who sentenced them is gonna look them over.

Ianniello: (unintelligible) He'll crack up there.

Andretta: Now he's pushing now—this guy—this guy looking for score. The guy wanted to see me but I don't know what's going on. I've known the guy for years, this guy's a Jew.

Ianniello: (unintelligible)

Andretta: I said, I don't know what the fuck is going on. He said the only reason I sent for you Stevey, was I never forget, a long time ago when I had Nunzie and Angelo working a couple of times with us and he done something with Tony, Tony always told me, if anything ever happens, Tony wasn't around, come and see you. I says them fuckin days are gone. Cuz I ain't up there no more, I can't help you. So I says really can't help you, I shouldn't be getting involved in your business, but you've been a pretty honorable guy, I'm getting, I don't know what to say to the guy, you know (unintelligible)

Andretta: He made one mistake, he did —one. I spoke to him—you don't come over, had a problem, he thought he was setting somebody up, without checking, the guy feed him some money. I don't know if it was twenty-five or fifty thousand bucks, to straighten all his problems out. (unintelligible) So I think in view what happened today, he still willing to do something, and get away from it. So in the meantime, he puts the heat

on Danny, now Danny, did this to him, did that to him. Now if the Federal Judge, he can involve us here there's probably a new case and more indictments.

Having heard Andretta's description of the NEMF situation and the threat it posed to persons associated with Andretta and Ianniello, Ianniello made a decision—Sciarra was to handle the matter for them:

Ianniello: You know what I think?

Andretta: What?

Ianniello: Michael's business. Let's let Michael try to square it. (unintelligible)

Andretta: Sammy, but Sammy got shoved out of the office. He's gotta step down. he kept pushing the guy. Instead of either letting him go, nobody gets in trouble.

Ianniello: Yeah, I wanted to do it.

Andretta: He came to tell Mikey last month (unintelligible). He says don't let up on the fucking guy. Crucify and bury him. I said no you gonna get five guys locked up with the mother fucker.

Ianniello: Don't do it. Tell Mikey not to do it.

The three taped conversations discussed above were each held in a construction trailer located in Edgewater, New Jersey. The fourth taped conversation took place on November 28, 1984 in the Palma Boy Social Club at 416 East 115th Street, New York City. The participants were Genovese Family boss Anthony Salerno, one of his caporegimes, Louis Gatto, Guiseppe Sabato and Cirino Salerno.

The conversation is an example of the authority exercised by Salerno. Gatto, a caporegime, was discussing with Salerno a dispute or possible dispute he was having with another caporegime in the Genovese Family, Ianniello. It was obviously Salerno's role to settle the dispute.

More significant for present purposes is the discussion of the situation at Local 560. The conversation shows Salerno's interest in Local 560 and his intent to keep control over it in the Genovese Family:

A. Salerno: But they threw everybody out of the office there.

Sabato: Yeah, they're all out.

A. Salerno: Everybody's out.

Sabato: They're all out.

A. Salerno: So how can you control it?

Sabato: What do you mean? They got the control in there.

A. Salerno: Who is that now?

Sabato: Matty.

A. Salerno: Oh, we got a guy in there?

Sabato: Sure.

The tapes constitute strong evidence that the Genovese Crime Family intended to maintain its control over Local 560 during the pendency of the appeal from Judge Ackerman's March 16, 1984 Judgment Order, during any period of trusteeship, and thereafter. The tapes constitute strong evidence that this control was to be exercised through Anthony Salerno's caporegime Matthew Ianniello and that Ianniello, upon the advice of Stephen Andretta, selected Michael Sciarra to be the man on the scene at Local 560 to whom orders and instructions could be given.

2. Sciarra's and Sheridan's Role

Neither Sciarra nor Sheridan was a participant in the taped conversations. I conclude that nevertheless the conversations constitute evidence against them. Fed.R. Evid. 801(d)(2)(E).

The attorney for Sciarra and Sheridan argues that "Mr. Sciarra and Mr. Sheridan have each undergone a metamorphosis since Judge Ackerman's decision in 1984." (Brief in Opposition to Motion of Government for Preliminary Injunction, at 49.) It is true that their recent deposition testimony did not contain the praise for and enthusiasm about the Provenzanos that appeared in their earlier testimony. It is also true that during their incumbency as President and Vice-President, they took certain steps to eliminate problems noted in the 1984 Opinion, such as preventing known criminals from frequenting Local 560's offices, removing the pool table and preventing card playing at the union hall, and announcing an open door policy for members. I do not find that Sciarra and Sheridan can be faulted for failing to take steps to remove the other Executive Board members from office, because all members were, in effect, on hold during the period of the stay of the March 16, 1984 Judgment Order. Their opinions and beliefs about the appropriateness of a trusteeship for Local 560 cannot be a basis to disqualify them from holding office, although knowledge of past corrupt practices and failure to take effective action to eliminate them and to make searching investigations of similar practices are certainly relevant factors in the present proceeding.

Regardless of the different tone of Sciarra's and Sheridan's most recent testimony, it demonstrates no awareness on their part of the depth of the problems described in the 1984 Opinion, their direct responsibility for the existence of those problems, or an intent to act decisively to root out the causes of those problems. The evidence does not suggest a metamorphosis on Sciarra's or Sheridan's part.

Stephen Andretta, a participant in two of the conversations, was a member of the Provenzano Group. Judge Ackerman found that the Provenzano Group members had acquired an interest in and control of Local 560 through a pattern of racketeering activity in violation of 18 U.S.C. sec. 1962(b) and that they conducted or participated in the affairs of the Provenzano Group enterprise through a pattern of racketeering activity in violation of 18 U.S. C. sec. 1962(c).

Stanley Jaronko, a participant in one of the conversations, was a member of Local 560's Executive Board along with Sciarra and Sheridan. Judge Ackerman found that the Executive Board members aided and abetted the Provenzano Group members in acquiring an interest and control of Local 560 through a pattern of racketeering activity and that they and the Provenzano Group members conspired to gain and maintain control of Local 560 through a pattern of racketeering activity.

The taped conversations are almost conclusive evidence that Jaronko was continuing the conspiracy. Neither Sciarra not Sheridan have ever repudiated the conspiracy or its objectives, and, in fact, each continues to deny the existence of the con-

spiracy and Genovese Family involvement in the affairs of Local 560. Their actions subsequent to the March 1984 Judgment Order are, as the government contends, consistent with and confirmatory of the continued existence of the conspiracy and their participation in it.

The most conspicuous instance of conduct consistent with and seemingly in furtherance of the conspiracy is the series of events relating to the NEMF controversy. It will be recalled that during Salvatore Provenzano's administration he repudiated an arrangement whereby NEMF was allowed to use predominantly non-Teamster workers and that Provenzano was using extreme pressure on Shevell to bring his entire operation under the Teamster National Master Freight Agreement. The union instituted grievance proceedings and NEMF instituted proceedings in this court seeking to enjoin the grievance proceedings.

Only a very short time after Sciarra became President of Local 560 Stephen Andretta briefed Ianniello about the NEMF situation. Each concluded that the legal proceedings posed a danger of incriminating their associates and that it was necessary to call off Salvatore Provenzano's vendetta against Shevell and NEMF. Ianniello decided it was "Michael's business. Let's let Michael try to square it." That conversation was held on December 7, 1984. On January 31, 1985 Sciarra sent to NEMF's attorney a proposed contract consisting of two and one-half pages.

The proposed contract purported to be between NEMF and "Warehousemen of Local Union No. 560." There were, of course, at that time only three Local 560 warehousemen employed by NEMF. Perhaps the contract could be read to include also the 10 NEMF drivers who were not owner-operators. Nothing was contained in the proposal concerning use of Apex employees as warehousemen or use of owner-operators.

At his deposition Sciarra testified that the proposed contract was sent on advice of counsel and was intended to apply to all persons not already a part of Local 560 and

was designed to provide an opening wedge to increase Local 560's presence at NEMF. Counsel to whom Sciarra referred undoubtedly was Local 560 counsel Edward A. Cohen, Esq. Taking into account that this proposed contract was sent by an experienced union negotiator pursuant to the advice of experienced labor counsel, it cannot possibly be construed to provide for additional Local 560 membership at NEMF.

By its terms, as noted above, it applied only to Local 560 warehousemen, of whom there were only three employed at NEMF. The rest of the warehousemen or dockmen at NEMF were not employees of NEMF at all. They were employees of Apex and members of another union. If the proposal were interpreted to include drivers as well as dockmen, there were only 10 Local 560 drivers at NEMF. The rest were owner-operators. Although the proposed contract provided that new employees hired in the container operation shall be placed on a 30–day trial basis (implying, perhaps, that they would be Local 560 members), there was nothing in the proposal requiring NEMF to hire new employees instead of continuing to use Apex employees as dockmen and owner-operators as drivers. Given the history of the bitter contract disputes between Local 560 and NEMF, the testimony of NEMF's labor attorney Gerald Glassman that there was to be an unwritten gentlemen's agreement that NEMF would take on new employees in those areas is difficult to view seriously. Rather, it would appear that the January 31, 1985 proposed contract was a meaningless document, a stop-gap designed for talking purposes while the grievance proceedings followed their normal course and terminated favorably to NEMF, as would be expected in view of Rubino's ultimately uninhibited testimony about past practices.

Gerald Glassman, a member of the law firm which represented NEMF in the grievance and in the court injunction proceedings, testified in support of Sciarra's position. He stated that prior to Sciarra becoming President of Local 560 (thus presumably before Ianiello decided to use him) Sciarra had told Glassman the dispute

should be settled, and that after he became President Sciarra sought to include the adjunct people (the Apex employees) in the bargaining unit. According to Glassman, after he offered to increase Local 560's employees from 13 to 20, with all others being subject to the terms and conditions governing the Apex employees, Sciarra sent him the January 31, 1985 proposed contract referred to above. Glassman stated that he rejected the agreement out of hand because it was so vague and uncertain that it would inevitably have to be taken to the Joint Local Committee for interpretation, and all members of the Committee (both Teamster and employer representatives) would have every reason to require NEMF to use only Local 560 members. This is not a particularly persuasive observation, because half of the Joint Local Committee has interpreted the ambiguous Slyboom and Rubino agreements in NEMF's favor so as not to require use of Local 560 members.

Glassman testified that Sciarra always maintained the position that all warehousemen should be covered by the National Master Freight Agreement and that he always urged the union position, never acceding to the demands of NEMF. If so, this position was not reflected in the January 31, 1985 proposed contract.

Local 560's long-time counsel, Edward A. Cohen, Esq., also testified to the effect that the January 31, 1985 proposal was not a sweetheart contract, that it was intended to cover all persons at NEMF. His opinion in this regard is no more persuasive than Glassman's and is not borne out by the language of the proposal.

Frank A. Jackiewicz, the associate trustee appointed by Judge Ackerman, was called as a witness by Sciarra and Sheridan. His function as co-trustee is to run the day-to-day operations of the local union. He was a thoroughly credible witness. He testified that you cannot tell whether a contract is a sweetheart contract simply by reading it. It is necessary to know all the circumstances which led to the agreement. Thus, simply by reading the terms of the January 31, 1985 Sciarra proposal, he could

not say whether it was a sweetheart contraact. He testified that during his dealings with Sciarra he never observed him to act in a way which was inconsistent with the interests of Local 560. Jackiewicz, of course, was unaware of the circumstances revealed by the evidence in this case, which demonstrates that NEMF engaged in a sweetheart arrangement with Local 560.

It may be of some significance that at the February 14, 1988 Local 560 meeting, Sciarra vehemently denied having sent any contract to NEMF. I conclude that it is unnecessary to decide what the January 31, 1985 proposal actually meant. The evidence strongly suggests that while he went through the motions of seeking Local 560 recognition for all employees at NEMF, Sciarra simply permitted the inevitable to take place—namely, perpetuation of the status quo at NEMF.

What was more important than the negotiations was the outcome of the grievance proceedings. Only if the union prevailed there and established that the past practices did not include 40–50 Apex dock workers, and 70 owner operators, could NEMF's stranglehold be broken. The government contends that while Salvatore Provenzano remained in office Rubino testified in those proceedings adversely to NEMF's position. The government further contends that after Sciarra became President, Rubino, in his February 20, 1985 testimony, "contradicted two prior sworn statements regarding his knowledge about the nature and extent of 'past practices' at NEMF. This testimony severely undermined the union's position; and, three months later, the Teamsters' own grievance machinery deadlocked, sounding the death-knell on the union's goal of bringing NEMF to heel." (Application for Additional Relief, pp. 43, 44.)

Rubino testified on three occasions. He gave deposition testimony on September 13, 1983 and on March 2, 1984. That was before Sciarra became Local 560 President and while Salvatore Provenzano was conducting his vendetta against Shevell. Rubino testified in the grievance proceedings on February 20, 1985. That was after Sci-

arra had become President and after Ianniello and Stephen Andretta had agreed that the vendetta should be ended that that Sciarra was to "square it."

The Rubino deposition testimony, in tone and content, was conspicuously different from his grievance proceeding testimony. At the former he initially denied knowing what the past practices referred to in the 1982 agreement were. During the course of the questioning on those two occasions he grudgingly admitted knowledge of certain facts which would constitute past practices. The taped conversations disclose that at that time he was under severe pressure from Salvatore Provenzano to oppose NEMF's position. ["So Danny don't help him [Shevell] now. Cause Danny's only got a year and a half to go on his pension, so he's afraid. Sammy's [Salvatore Provenzano] got him bulled now." (December 12, 1984 taped conversation, quoted more fully above)].

At the February 20, 1985 Joint Local Committee proceedings, Rubino was far more forthcoming, declaring his knowledge of the details of the past practices—such as NEMF's use of Apex warehousemen. NEMF's trial counsel, Theodore M. Eisenberg, Esq., was called by Sciarra and Sheridan. He testified concerning Rubino's knowledge and testimony:

> I thought that he [Rubino] had made an agreement back in 1982 showing exactly in every detail how the company operated its business, and that he, in terms of both owner/operators, in terms of dock men, that he had been a little hesitant in some ways in his testimony because he was under pressure from the union ...

> He was not being entirely candid. He had come 70 percent of the way, but we wanted him to come the other 30 percent. (Tr. pp. 581–82.)

The pressure to oppose NEMF's position was removed from Rubino when Salvatore Provenzano left office. His subsequent willingness to be more forthcoming in his testimony concerning NEMF's past practices tends to confirm that Ianniello's and Andretta's instruction to Sciarra to square the NEMF situation was sent, received and acted upon.

Two other circumstances tend to confirm the continued existence of the Genovese Family program to maintain control over Local 560 and Sciarra's and Sheridan's continued participation in a conspiracy having such a purpose.

Although the Executive Board members were entitled to remain in office by virtue of the stay of Judge Ackerman's order, the stay was not a license to continue RICO offenses or to maintain the status quo. Regardless of the stay, the 1984 Opinion and Order were mandates for drastic changes in the way Local 560 did business. Despite this, Sciarra, Sheridan and the other Board members permitted the administrator of certain Local 560 Welfare Plans to remain in office after he had been convicted of obstruction of justice in a case involving fraud upon the Plans, and they continued to contract with a provider of legal services to certain members under circumstances so extraordinary as to almost defy belief.

In 1959 Marvin Zalk was prosecuted for having taken kickbacks from an insurance company in return for the contracts with the Passaic and Bergen Counties Trucking Employees Welfare Fund. His conviction was reversed on appeal on technical statutory grounds, but there was no question that he had received the payments. *State v. Croland*, 31 N.J. 380, 157 A.2d 506 (1960). He was administrator of the Bergen–Passaic Pension Plan when 51% of its assets were misappropriated for the Romano (Florida) Loan scheme during the mid–1970's. *United States v. Local 560, Intern. Broth. of Teamsters*, 581 F.Supp. 279 (D.N.J.1984).

On December 21, 1983 a federal jury convicted Zalk of obstruction of justice in the so-called Dental Plan Case involving the Local 560 Welfare Plans. *United States v. Marcus, et al.*, Cr. 83–104, D.N.J. Local 560's attorney, Edward A. Cohen, Esq. attempted to justify the failure to take any action against Zalk after the jury verdict on the ground that the statutory bar was not effective until after his appeal

and that "as a fund administrator we considered him an excellent fund administrator, not average, but an excellent one, and an excellent individual." Further, "I knew of absolutely no basis, no reason to conclude, or facts to conclude that Marvin Zalk was in any way a bad person of any sort." (Tr. p. 412.) Apparently Cohen had forgotten the 1957 kickback incident and the Romano debacle and considered a jury verdict of guilty as a mere trifle that did not even require the precaution of a suspension.

The prepaid legal services situation began before Sciarra and Sheridan entered upon their offices as President and Vice President and continued throughout their administration.

In 1977 or 1978 Teamsters Local 84, which Mr. Cohen represented, decided to establish a prepaid legal services plan for its members. Among the officers of Local 84 were Gabriel Briguglio, a defendant in the present case and a member of the Provenzano Group, and Andrew Reynolds, a Local 560 business agent who was forced to step down after he pleaded the Fifth Amendment in the present case when asked about his conversations with Ianniello and Nunzio Provenzano.

Cohen was informed that Local 84's Executive Board had decided upon the law firm of Citrino, Balsam and DiBiasi to provide the services. Cohen dealt primarily with Thomas A. DiBiasi, Esq., and at the outset advised him how to proceed to obtain IRS approval of a plan. A direct payment plan was decided upon whereby the employer paid the service provider, the law firm, without the intervention of a trustee.

The Plan received the requisite governmental approval and started its operations. In 1980 Local 84 merged with Local 560, but the prepaid legal services plan continued to provide benefits to the former Local 84 members.

In mid–1984 the Local 560 Executive Board decided to provide pre-paid legal services benefits to the other members of Local 560. Cohen was asked to prepare a plan, and he drew up a trustee program. In addition he contemplated converting the already existing plan into a trustee arrangement. The DiBiasi law firm was designated to provide the additional services in spite of clear indications that it was unqualified.

More than one-half million dollars had been paid to the law firm under the direct payment plan, yet the law firm had failed to account for use of these funds or to provide utilization reports. Cohen sought to justify the failure to supply such reports to the Local 560 Welfare Fund trustee on the ground that government regulations did not require the reports for direct payment plans, and the applicable service agreement called for reports only when requested by the Welfare Fund trustee. Cohen's reading of the service agreement is patently flawed. The agreement specified: "The Designated law Firm ... shall report to the Local and the applicable Employers from time to time as reasonably requested, *but not less frequently than once every forty-five (45) days.*" (Exh. D9) (emphasis added).

DiBiasi has been a member of the New Jersey Bar since November 28, 1972. On August 14, 1979 he was indicted in this court on charges involving a multi-million dollar bank fraud. On November 18, 1980 he pled guilty to a reduced misdemeanor charge and was later sentenced to a term of probation. As a result of the conviction, he was suspended from the practice of law for three months during 1986.

Cohen, representing Local 560, concluded as a matter of law that the conviction precluded DiBiasi but not the rest of his firm from representing Local 560 employees under the direct payment plan. He relied on a letter from the law firm's managing partner, L. William Balsam, Esq., that DiBiasi would not provide services under the Plan.

It is evident that Sciarra, Sheridan and the other Executive Board members were indifferent to and did not check out the law firm's capabilities and qualifications, or lack of qualifications, before designating them the service provider under the TENJ plan in August of 1984, nor did they take appropriate action as other events unfolded.

On September 7, 1984 DiBiasi requested and received a $50,000 "advance" in order to finance the expansion of his law firm's resources and thereby to provide the services contemplated. DiBiasi promised to repay the amount by offsetting it against the per capita contributions which were to begin in October. Notwithstanding this agreement as to the method and timing of repayment, the $50,000 was not repaid or otherwise recouped during the incumbency of Sciarra and Sheridan. Indeed, it was not recovered until some two years later, when the Trustee discovered the situation and took action to recover the funds.

On January 31, 1985, the managing partner in DiBiasi's law firm, L. William Balsam, Esq., was suspended by the New Jersey Supreme Court in connection with allegations of misconduct which resulted in the court freezing Balsam's trust accounts. Over a year later, on April 28, 1986, Balsam committed suicide. The minutes for the TENJ meetings for 1985 and 1986 do not reflect any formal notification by the law firm with respect to this matter, although correspondence between February 27 and May 24, 1985 did reflect that Balsam's name had been removed from the firm's letterhead. It is inconceivable that the TENJ Fund's and Local 560's attorney Cohen did not know of these events.

On April 15, 1985, Sciarra and Sheridan voted to grant the law firm a three-year contract in place of the original one-year contract, which still had four months to run.

At the TENJ meeting on May 24, 1985, the trustees approved a modification of the DiBiasi law firm's malpractice insurance coverage from the original requirement of $1,000,000 per claim/$5,000,000 aggregate to a flat amount of $3,000,000 each. This modification enabled TENJ to accept the certificate which DiBiasi tendered pursuant to the requirements of the service agreement.

Just one month later the law firm's malpractice insurance was cancelled altogether. For seven months thereafter, the firm concealed that fact from the TENJ trustees. In January of 1986, DiBiasi applied to the TENJ trustees for a waiver of the malpractice insurance requirement. He did not even then disclose the fact that the insurance had been cancelled for nearly seven months and that the firm had been operating in violation of the provisions of the contract. The trustees considered DiBiasi's request, but refused to grant the waiver. Not until some seven weeks later did DiBiasi finally secure coverage, but then only in the amount of $150,000/$350,000. DiBiasi's concealment in this regard caused the trustees to file a false Form 5500 report with the Department of Labor, misstating the amount of the insurance coverage. (18 U.S.C. secs. 1027 and 2).

On May 5, 1986, the law firm's counsel informed several of the plan trustees of the fact that the firm had been operating for some eight months in derogation of the contract requirements. Counsel for the DiBiasi law firm made this disclosure as part of a proposal to obtain an extension of the service contract in order to collateralize a bank loan of some $150,000 that the firm then needed in order to resolve its financial difficulties arising out of the Balsam difficulties.

The trustees approved the extension, but inserted a provision allowing them to cancel for any reason on 60 days notice. Trying to excuse extension of the contract, Local 560's then counsel Cohen testified that the service contract with the DiBiasi law firm could not be terminated (Tr. 439) for legal and practical reasons. As a practical matter, he asserted, the law firm was in the midst of its representation of clients and as a legal reason, he opined, termination might subject the trustee of the TENJ Fund to liability. Both grounds are absurd. Suitable arrangements could have been made to attend to pending cases. The fraud and grievous breaches of contract committed by the law firm relieved the TENJ Fund of any obligation to continue the contract.

In isolation the Zalk and DiBiasi situations might be passed off as gross incompetence on the part of Sciarra, Sheridan and the other Executive Board members. When viewed with the other evidence, in-

cluding Sciarra's and Sheridan's continuing inability to acknowledge forthrightly in their testimony the existence of the RICO conspiracy found by Judge Ackerman, the Zalk and DiBiasi situations must be viewed as corroborative of Sciarra's and Sheridan's continued participation in the Genovese Family conspiracy to maintain control of Local 560 in violation of RICO. On this critical issue I think it is likely that the government will ultimately succeed.

3. The Present Status of Local 560

On June 23, 1986, all appeals from the March 16, 1984 Judgment Order having been concluded, Judge Ackerman appointed Joel Jacobson Trustee of Local 560. On May 12, 1987 Judge Ackerman appointed Edwin H. Stier, Esq. in place of Jacobson. Stier had an extensive law enforcement background, particularly in the field of organized crime. At the same time Judge Ackerman appointed as Associate Trustee Frank Jackiewicz, who had been a Teamster for 46 years and had served as head of a local union, had negotiated national contracts, and had chaired pension and welfare funds.

Before assuming his office as Trustee, Stier conducted an extensive inquiry into the current status of Local 560, including a review of much of what is now evidence in the present proceeding. He concluded that the Genovese Family was still struggling to control Local 560 and that the incarceration of some members of the Provenzano Group did not eliminate the danger. In his experience organized crime groups have the resiliency to regenerate, restructure and survive beyond prosecution, incarceration, murders and disappearances.

Stier set three objectives for himself: (i) He sought to conduct the day-to-day operations of the union so as to provide effective representation to the membership. Jackiewicz was to provide important assistance in this area. (ii) He sought to use his own background in conducting investigations to organize and oversee inquiries into the affairs of the union and the pension and welfare funds. (iii) He sought to encourage the members of Local 560 to throw off years of passivity in the face of Provenza-

no domination and to participate in the affairs of the union.

Stier retained most of the business agents appointed by his predecessor. Some received training from the IBT Leadership Academy, and all worked with Jackiewicz and, until his death, Edward Kramer, who had extensive experience in contract negotiations. Procedures were developed for contract negotiations which included participation by representatives of the bargaining unit.

Fundamental changes were required and implemented in connection with the administration of the union and its pension and welfare funds. Legal expenses were reduced. A computerized bookkeeping system was installed. A controller was retained for the pension and welfare funds and the accounting functions are being centralized. A chief auditor was hired to work with the Controller to cure serious deficiencies in the procedures which had been in effect. Claims against employers for underpayment of contributions of approximately $1.5 million have been filed. The fees and brokerage commissions of the investment managers were renegotiated, resulting in savings of approximately $1 million per year. Total automation of the pension and welfare funds is underway.

The Trustee found the most difficult task to be the encouragement of membership participation in the running of the union after 25 years of racketeer control. To this end he started a newspaper, the 560 Free Press, in which members could express their views. He has conducted membership meetings and separate craft meetings for each of the major segments of the union—freight, car hauling, construction and miscellaneous.

Upon his assuming the position of Trustee, Stier found that the members had a feeling of powerlessness with respect to the union's leadership and their right to know what was going on. They accepted as inevitable the return to power of the previous leadership. They were inhibited by fear of physical and economic reprisals.

Early in the Jacobson trusteeship a group known as Teamsters for Liberty was

formed. However, it was not and never has been critical of the former leadership and of conditions which prevailed under that leadership. Rather, it is dedicated to the termination of the Trusteeship and of what it characterizes as "the government takeover of our union." (Exh. G95).

To this end Teamsters for Liberty has circulated petitions demanding an end to the trusteeship; it has written and conferred with Congressmen, Senators and other government officials; it has sponsored rallies attended by public officials, labor leaders, and other guests; it has published its own newspaper, We the People; it has retained attorneys to sue in a new proceeding to terminate the trusteeship.

Alfred Laurie, a trustee and recording secretary of Teamsters for Liberty, testified. He described the process of organizing Teamsters for Liberty, stating that there were 2,500 signatures obtained on their petitions at the first rally, a figure which has since doubled. He testified that approximately $33,000 has been raised which has been used to cover the expenses of public meetings, to print the newspaper, to pay for flyers and posters and above all to carry on an election campaign for its slate of candidates. Since its formation Teamsters for Liberty has sponsored Sciarra and Sheridan for President and Vice-President of Local 560. Jaronko is an active member of Teamsters for Liberty.

There can be no question that Teamsters for Liberty is a powerful force within Local 560. An examination of the videotape of the January, 1987 membership meeting reveals the organization's ability to dominate the proceedings and shout down or otherwise deal with its opposition. Laurie may have exaggerated the number of supporters, but his testimony and other evidence support the conclusion that Teamsters for Liberty is a strong force among Local 560's members.

In spite of Teamsters for Liberty's head start, other groups in the union have organized, and some voice criticism of the former leadership and its ways. There are now other candidates for the Presidency, Vice-Presidency, and Executive Board.

Stier concluded that although the forces conducive to uncoerced conditions within Local 560 are fragile and still threatened by the Genovese Family's take-over efforts, an election with suitable controls was feasible. On February 11, 1988 the Court extended the Trusteeship until December 6, 1988 and ordered that general elections be held prior to that date. The election is scheduled for November, 1988. The vote is to be by secret ballot. The ballots are to be mailed to each member's home to reduce the opportunities for undue pressure. Nominations are to be made at a membership meeting called for October 9, 1988.

It is the object of the government's application to enjoin Sciarra and Sheridan from running in this election. It is the contention of representatives of Teamsters for Liberty that barring these two persons from the election would have a devastating effect on that organization's efforts to win power through the democratic process and it would have a devastating effect on the democratic process itself, substituting rule by court and government fiat for popular selection of leaders. It is the contention of the government that permitting Sciarra and Sheridan to resume office would turn Local 560 over to renewed rule by the Genovese Family, undoing all the efforts expended to date to free the union from the grip of organized crime. Removal of Sciarra and Sheridan from office should they be elected, the government contends, would have an even more devastating effect on union democracy than if they were prevented from running in the first place.

In the light of all these facts it must be determined whether the preliminary relief the government seeks should be granted.

## IV. LEGAL CONCLUSIONS

### A. Preliminary Legal Issues

Sciarra and Sheridan raise several legal contentions which, if accepted, would preclude consideration of the merits of the government's application. They advance other contentions which go to admissibility of evidence.

First, Sciarra and Sheridan originally contended that the court lacked jurisdiction to consider the government's application pending the Third Circuit's determination of their application for a rehearing en banc in *United States v. Sciarra and Sheridan,* 851 F.2d 621 (3d Cir.1988). The government sought to depose Sciarra and Sheridan in December, 1987. Sciarra and Sheridan filed a cross-motion seeking Judge Ackerman's recusal pursuant to 28 U.S.C. sec. 455, and subsequently appealed the granting of the government's application and the denial of their cross-motion.

The Third Circuit affirmed the order requiring Sciarra and Sheridan to submit to oral deposition. It dismissed without prejudice their appeal from the denial of their recusal motion on the ground that they did not have standing to invoke sec. 455 in their capacity as non-party witnesses. The Third Circuit stated that "[i]n the event that a proper party institutes an adversarial action before Judge Ackerman designed to modify or alter the substantive rights of Sheridan and Sciarra, petitioners may reassert without prejudice a motion requesting the judge's recusal." At 636.

On July 25, 1988 the Third Circuit denied the application for a rehearing en banc. However, Sciarra and Sheridan have indicated that they intend to file a petition for a writ of certiorari.

In any event, there is no basis to stay a proceeding seeking injunctive relief pending what is, at best, an interlocutory appeal. *See Venen v. Sweet,* 758 F.2d 117, 120 n. 2 (3d Cir.1985). Absent a showing that the collateral order appealed from, if vacated, would vitiate these proceedings, no such stay should issue. Wright & Miller, *Federal Practice and Procedure* vol. 15, ch. 9, sec. 3911, at 497–98 (hereafter "Wright, Miller & Cooper"); *Plaquemines Parish Commission Council v. United States,* 416 F.2d 952, 954 (5th Cir.1969); *O'Brien v. Avco Corporation,* 309 F.Supp. 703, 705 (S.D.N.Y.1970). This case presents no special circumstances. Certainly, the question of Judge Ackerman's recusal is irrelevant to this application. Furthermore, the order requiring the depo-

sitions of Sciarra and Sheridan does not raise issues of constitutional magnitude or impinge upon any protected rights. *See United States v. Sciarra and Sheridan, supra* at 636.

Next, Sciarra and Sheridan urge that the order to show cause route pursued by the government is procedurally defective. They contend that the only action brought against them culminated in the March 16, 1984 judgment order and that there is no action pending against them. According to their reasoning, the only route the government can pursue against them is to institute a new action naming them as defendants and seeking preliminary injunctive relief.

The procedure adopted by the government does raise theoretical difficulties. If Sciarra and Sheridan were still parties to the original proceeding, there is little question that it would be appropriate to reopen those proceedings to grant additional relief if necessary to effectuate the equitable relief already granted or to further the administration of the Trusteeship. However, in its recent opinion the Third Circuit stated that "... we conclude that the petitioners are, at this point, only non-party witnesses to an investigation, rather than parties to an actual case or controversy designed to adjudicate their substantive rights." At 630.

That language might be construed to suggest that Sciarra and Sheridan could be rejoined as parties if relief were sought affecting their substantive rights. However, in view of the fact that there is some doubt on that point I shall treat the present application as one to supplement or amend the complaint in the underlying action. In light of the procedural questions, the government has already served upon Sciarra and Sheridan a complaint embodying the same allegation and requests for relief as the order to show cause application.

Fed.R.Civ.P. 15(a) and (d) allow amendment and supplementation of a complaint even after judgment in order to ensure complete relief. Amendment "shall be freely given when justice so requires." A motion for leave to amend should be denied

only where there is a finding of "undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, futility of amendment. ..." *Foman v. Davis*, 371 U.S. 178, 182, 83 S.Ct. 227, 230, 9 L.Ed.2d 222 (1962).

■ Rule 15(d) provides that a court may permit a party to serve a "supplemental pleading setting forth transactions or occurrences or events which have happened since the date of the pleading sought to be supplemented." An application for leave to supplement under Rule 15(d) is addressed to the sound discretion of the court and leave should be granted if it will promote the just disposition of the case, will not cause undue prejudice or delay or trial inconvenience and will not prejudice the rights of any parties. *Bates v. Western Electric*, 420 F.Supp. 521 (E.D.Pa.1976).

■ Here every consideration points to allowing the government to amend and supplement its complaint to allege the post-February, 1984 developments. Sciarra and Sheridan were parties to the original proceedings upon which the present application so heavily relies. They have had a full evidentiary hearing on the post–1984 allegations and have had ample opportunity to meet those allegations and present their own evidence. Both sides would be prejudiced by any procedure which entailed delay in the resolution of the issues which the government raises. The nomination and election for Local 560's officers and Executive Board is fast approaching. The procedure being followed here allows for a hearing, a decision and emergency appellate review before the election and perhaps before the deadline (or an extended deadline) for nominations.

The issues which the government raises are very serious ones and the future integrity of Local 560 may depend on how those issues are resolved. Amendment and supplementation of the complaint and the hearing and disposition of an application for preliminary injunctive relief permits these issues to be resolved in a time frame within which effective relief can be granted.

The procedural problems which Sciarra and Sheridan raise can, therefore, be resolved by treating the government's complaint as an amendment or supplement to the original complaint resulting in their being rejoined as defendants in the case. They will be given sufficient time to file a formal answer. There are quite likely other procedural routes which could be followed to achieve the same end. But this route is fair to the parties, complies with Rule 15(a) and (b), and permits the court to address the critical substantive claims promptly.

■ Sciarra and Sheridan also urge that the 1984 Judgment Order bars the government's request for injunctive relief by virtue of the doctrines of res judicata, merger and collateral estoppel. They contend that since the original complaint did not seek and the March judgment order did not grant relief barring them forever from holding union office, such relief cannot be sought now. There is no merit to this position. The government alleges new facts which it asserts require additional relief. These facts were not available when the original relief was granted, and there is no reason why the government cannot advance them as grounds for further equitable remedies.

■ Sciarra and Sheridan argue that Section 504 of Title 29, United States Code, is the exclusive means by which a court can bar a person from holding union office. In *United States v. Local 560 of Intern. Broth., Etc.*, 780 F.2d 267, 296 (3d Cir. 1986), the Third Circuit held that, pursuant to sec. 1964 of Title 18, a district court could enjoin an individual from reacquiring office as well as remove an individual from office. *Id.* at 296. Although the court did not mention Section 504, I am sure it was fully aware of that section, and did not consider it a bar to the kind of relief granted by the district court. The question cannot be relitigated here.

■ Sciarra and Sheridan contend that their deposition cannot be used in this pro-

ceeding because they were taken pursuant to an order of Judge Ackerman and because for a variety of reasons Judge Ackerman was disqualified from proceeding in this case. I conclude that by fair implication, the recent Third Circuit opinion disposes of this contention. The court affirmed the order requiring the depositions without resolving the question of Judge Ackerman's disqualification in matters affecting Sciarra's and Sheridan's substantive rights. Given the affirmance of the order requiring the deposition, it would be anomalous to hold that the deposition could not be used when appropriate to do so under the Federal Rules of Civil Procedure. They were not tainted in any way and constitute sworn testimony of a party witness.

Sciarra and Sheridan object to the use of the four taped conversations against them. I have previously made the requisite findings to permit the use of the conversations against them by virtue of Fed.R.Evid. 801(d)(2)(E).

### B. Effect of United States v. McNally

Sciarra, Sheridan, and plaintiffs in the *McGarrigle* case as amici argue that the legal basis for the trusteeship has disappeared, and that the entire trusteeship must be vacated, including control by this court over who will be permitted to run in elections for union office. The argument is that *McNally v. United States*, —— U.S. ——, 107 S.Ct. 2875, 97 L.Ed.2d 292 (1987), in which the Supreme Court held that mail fraud convictions cannot be predicated upon the deprivation of "intangible rights," such as citizens' rights to "good government," applies equally to the Hobbs Act, and to the aiding and abetting in extortion of union members' rights to democratic participation which formed the basis for Sciarra's and Sheridan's civil RICO liability. I find that this argument does not withstand examination.

I question first Sheridan's and Sciarra's suggestion that the Hobbs Act is if anything more narrowly limited to property injuries than the mail fraud statute at issue in *McNally*. The Hobbs Act was specifical-

ly aimed at, *inter alia*, labor racketeering, and extortion by corrupt labor leaders is involved here. *McNally* was an exercise in statutory interpretation, and it is not at all clear that that decision will be extended to the Hobbs Act. To date, property has been broadly defined in the Hobbs Act context. *See United States v. Zemek*, 634 F.2d 1159 (9th Cir.1980), *cert. denied*, 450 U.S. 916, 101 S.Ct. 1359, 67 L.Ed.2d 341 & 452 U.S. 905, 101 S.Ct. 3031, 69 L.Ed.2d 406 (1981) (tavern owner's right to solicit business free from threatened destruction and physical harm fell within scope of protected property rights under this section); *United States v. Santoni*, 585 F.2d 667 (4th Cir. 1978), *cert. denied*, 440 U.S. 910, 99 S.Ct. 1221, 59 L.Ed.2d 459 (1979) (right to company to make business decision free from outside pressure wrongfully imposed constitutes "property" for purposes of extortion under this section); *United States v. Nadaline*, 471 F.2d 340 (5th Cir.), *cert. denied*, 411 U.S. 951, 93 S.Ct. 1924, 36 L.Ed.2d 414 (1973) (intangible property such as business accounts and unrealized profits therefrom are included within those rights protected by Hobbs Act). Given Congress's specific concern in the Hobbs Act in addressing labor racketeering, and its lack of interest in using the mail fraud statute to criminalize all public and private corrupt behavior, the definition of property may well be more inclusive of "intangible" rights in the Hobbs Act than in the mail fraud context.

Assuming that the standards for statutory interpretation are the same, I am nevertheless unpersuaded that *McNally* undermines the trusteeship. Sciarra and Sheridan seek to portray rights of union members as entirely ethereal, akin to the undifferentiated "right" of citizens to good government. However, *McNally* merely required that some type of property interest have been infringed:

> ... the mail fraud statute clearly protects property rights, but does not refer to the intangible right of citizenry to good government.

—— U.S. at ——, 107 S.Ct. at 2879, 97 L.Ed.2d at 299–300. Justice Stevens noted in dissent the potential effect of the aban-

donment of the "intangible rights" doctrine on cases involving rights other than the general right of the citizenry to a fair and impartial government. Examining the effect of the majority's decision on cases involving employee fraud, Justice Stevens wrote:

> When a person is being paid a salary for his loyal services, any breach of that loyalty would appear to carry with it some loss of money to the employer—who is not getting what he paid for. Additionally, "if an agent receives anything as a result of his violation of a duty of loyalty to the principal, he is subject to a liability to deliver it, its value, or its proceeds to the principal." *Restatement (Second) of Agency*, sec. 403 (1958). This duty may fulfill the Court's "money or property" requirement in most kickback schemes.

*McNally*, —— U.S. at —— n. 10, 107 S.Ct. at 2890 n. 10, 97 L.Ed.2d at 313 n. 10.

The Court apparently adopted that theory in *Carpenter v. United States*, —— U.S. ——, 108 S.Ct. 316, 98 L.Ed.2d 275 (1987), upholding convictions for the wrongful appropriation and transfer of confidential market-moving information which was soon to appear in the "Heard on the Street" column of the *Wall Street Journal.* As in *Carpenter*, the intangible rights here were closely linked to property and economic losses on the part of union members. *Cf. United States v. Case*, 684 F.Supp. 109 (D.N.J.1988) (defendant not entitled to reversal of mail fraud conviction where jury could not have convicted defendant unless it found that object of conspiracy was to obtain contracts and money from generators of hazardous waste through fraud) (on appeal); *United States v. Italiano*, 837 F.2d 1480, 1485–86 (11th Cir.1988) (observing that bribery allegation might satisfy *McNally*, but reversing mail fraud conviction because this charge was not basis for indictment); *United States v. Perholtz*, 836 F.2d 554 (D.C.Cir.1987) (upholding mail fraud conviction where computerization costs to Small Business Administration were inflated by fraud, distinguishing *McNally* on grounds that in that case

government was found to have suffered no tangible financial loss).

The Third Circuit has further elaborated *McNally* in *United States v. Zauber* and consolidated cases, 857 F.2d 137 (3d Cir. 1988). In *Zauber*, the court reversed mail and wire fraud convictions based on an "intangible rights" theory. The court noted that the indictment was framed in terms of intangible rights, and that the jury had been instructed exclusively as to the intangible rights theory. At 145. Thus, the conviction did not necessarily reflect a conclusion that defendant pension fund trustees' and counsel's improper investment of funds had caused any actual loss to the fund. The Court of Appeals examined the strong evidence that pension fund investments which had been prompted by kickbacks had resulted in a lower rate of return than alternative investments would have, to beneficiaries' detriment. The court did not find this evidence sufficient, noting that the contractual rate of return on the dubious investment had been paid, and holding that "[w]e do not believe that a lost investment opportunity, without proof of an actual loss of a guaranteed investment return, can qualify as an 'actual loss' for purposes of the mail and wire fraud statutes."

In the instant case, determining that actual monetary loss occurred requires neither speculation nor inferences which go beyond adjudicated factual findings. Judge Ackerman, while his language emphasized union officials' betrayal of members' trust, clearly found that the Executive Board to which Sciarra and Sheridan belonged had used union funds for improper purposes, thus directly depriving the union of money. Payments to Anthony Provenzano after he was incarcerated, for instance, involved a clear tangible loss to union members for whose benefit the funds in question should have been used. Further, all Local 560 members paid dues, expecting to receive from the union the usual services which a union performs. They were deprived of the benefits for which they had made payments.

Even assuming that *Zauber* does reflect a new, extremely restrictive reading of the mail and wire fraud statutes, and that the circuit will extend that reasoning to the instant Hobbs Act charges, the broader point concerning the court's remedial powers in RICO cases remains. Even assuming that Judge Ackerman's determination with respect to Hobbs Act violations is invalid in light of *McNally*, there remain ample predicate racketeering acts to justify broad injunctive relief. Barring Sciarra and Sheridan from union office need not rest on personal adjudications of misconduct by them as individuals, but is also justified by their apparent role in the Genovese crime family's plan to maintain control over Local 560.

■ Thus, the lesson of *McNally* is not that government agencies, labor unions, and other theoretically participatory, nonprofit institutions cannot suffer from mail fraud, but that some concrete deprivation of property or funds must be shown to bring conduct into the mail fraud statute. *McNally* bars federal prosecutors from using the broad mail fraud statute to attack previously unethical but non-criminal conduct; it does not insulate misappropriation of funds and concrete resources.

■ The history of this case, and the findings of Judge Ackerman as affirmed by the Third Circuit, make clear that the extortion of Teamsters' rights to democratic participation resulted in clear material deprivations for union members.

I cannot accept the government's claim that the only reason that workers join unions is for material improvements, and that accordingly any misconduct by union officials constitutes mail fraud or a Hobbs Act violation. The Supreme Court implicitly rejected such a notion in *McMahan v. United States*, —— U.S. ——, 107 S.Ct. 3254, 97 L.Ed.2d 754 (1987), which vacated *United States v. Price*, 788 F.2d 234 (4th Cir.1986), a case in which the court of appeals had held that a scheme by union staffers to defraud the union of their "faithful and honest services" constituted mail fraud. Thus, certain types of union misdeeds might violate only "intangible" rights and

thus not be actionable as mail fraud. The activities alleged here, however, are not all of that sort. Judge Ackerman noted the deprivation of union members' rights of self-government and the pervasive disregard for the protections of the Labor Management Relations Disclosure Act, but did not rely entirely on such abstract injuries. The 1984 Opinion describes a broad range of activities which deprived members of union property which had been, of course, built up through their dues, organizational activity, and economic struggles. Local 560 owed a judicially enforceable, albeit practically extremely difficult to enforce, duty of fair representation to individual members. Despite the source and purpose of union funds, substantial amounts of this money were used not to finance collective bargaining or administer contracts or assist additional workers in organizing, but for the personal benefit of union officials. Sciarra and Sheridan permitted and supported diversion of union resources for an increased pension for incarcerated Anthony Provenzano, an expenditure with no conceivable benefit to the union. The union offices—union-funded facilities to which workers were entitled to come freely to discuss grievances, benefits problems, and internal union affairs—were frequented by known or reputed criminals, many of them with a history of violence. The Third Circuit affirmed these findings, holding that the evidence "more than adequately supported" the district court's finding that the Executive Board aided the Provenzano Group in extorting members' rights by, *inter alia*, making certain appointments and reappointments to union office and failing to remove certain appointees from office. 780 F.2d at 284.

The evidence developed before me indicates that these previously adjudicated problems continued into the period in which the creation of a trusteeship was stayed pending appeal and application for certiorari. As described above, during this period, union resources continued to be used to pay persons without relevant qualifications other than loyalty to the old regime. There was evidence of continuation of a sweet-

heart contract. There was evidence that the Genovese Crime Family sought continued control of Local 560—though which it could profit and union members would suffer financial loss. The essence of a sweetheart deal is, of course, that workers in that operation are "sold out;" meanwhile, the position of other union members is weakened when their employers must compete against contractors with sweetheart arrangements. Workers who might have been inclined to defend their material interests against these depradations were subject to intimidation, as, for instance, the previously described incident in which Stanley Jaronko assaulted August Muller.

While Sciarra and Sheridan may have performed substantial services for many union members and acted at times as dedicated trade unionists, where the interests of members and organized crime conflicted, as they often did, Sciarra and Sheridan aided the Provenzano Group in maintaining its control over Local 560. In summary, the particular acts which Sciarra and Sheridan were previously adjudicated to have committed were inextricably connected with diversion of union funds and resources for improper purposes. Thus there is no merit to the suggestion that the Supreme Court decision in *McNally* undercuts the legal foundation of the instant case.

### C. Preliminary Injunctive Relief

The grant of a preliminary injunction requires consideration of four factors: (1) whether the applicant has made a strong showing of probability of success on the merits of the litigation; (2) whether the applicant will be irreparably injured *pendente lite* if relief is not granted; (3) the probability of harm to other parties if the injunction is granted or denied; and (4) the effect upon the public interest of the grant or denial of the injunction. *In re Arthur Treacher's Franchise Litigation*, 689 F.2d 1137, 1143 (3d Cir.1982). Title 18 U.S.C. sec. 1964(b) explicitly authorizes the Attorney General to institute proceedings seeking injunctive relief against violations of sec. 1962.

I have already stated that the government has made a strong showing that it is likely to succeed on the merits. The 1984 Opinion contains the basic findings of RICO violations which Sciarra and Sheridan aided and abetted and with respect to which they conspired. The government has produced highly persuasive evidence that after the March 16, 1984 Judgment Order the Genovese Crime Family without interruption continued the very conduct found to have been a RICO violation in the 1984 Opinion. It sought to continue its control of Local 560 for criminal purposes. The government also has produced highly persuasive evidence that after March 16, 1984 Sciarra and Sheridan (among others) continued their aiding and abetting and conspiracy role. In particular Genovese Family caporegime Matthew Ianniello designated Sciarra as the Executive Board member through whom he would exercise control of Local 560.

Sciarra and Sheridan rose to power under the Provenzano Group. In the process, each aided and abetted and conspired with members of that Group to extort rights, money and property from the members of Local 560 in violation of the Hobbs Act, 18 U.S.C. sec. 1951 and the provisions of civil RICO, 18 U.S.C. sec. 1962(b). The government is likely to succeed in proving at the final hearing that the conduct continued during the period after March 16, 1984, when they served as President and Vice-President, respectively, of Local 560. If they are now returned to office upon the termination of the Trusteeship, it is highly likely that the Genovese Family, through them, would reassert control over Local 560. The Third Circuit opinion on the appeal from the March 16, 1984 Judgment Order noted that "[s]ection 1964(a) of the RICO Act enables the district court, in its discretion, to employ a wide range of civil remedies," including the power to remove a person from office and to bar a person from reacquiring office. 780 F.2d at 295–96. An order preliminarily barring Sciarra and Sheridan from reacquiring union office is therefore within the power of the court under the RICO Act.

The government will unquestionably be irreparably injured if preliminary injunctive relief is not granted. The effort to rid Local 560 of racketeer control has entailed the expenditure of an extraordinary amount of time, effort and money by the government. These expenditures were in connection with the extensive investigatory and preparatory work required to lay a foundation for the suit, the conduct of the suit and defense of the appeal, the continued monitorings of the Local 560 situation after the issuance of the 1984 Opinion, and the investigations and hearing efforts entailed in the supplemental proceedings. All this work will have been expended for no purpose if an election returns Local 560 to the Genovese Family and its minions.

Sciarra and Sheridan urge that they will be irreparably injured if they cannot run for the positions they seek. Teamsters for Liberty notes that its members have raised and spent large sums of money for the campaign to elect Sciarra and Sheridan and that many hundreds of Teamsters have volunteered their time in the campaign. The hopes and expectations of all these people would be shattered, it is contended, and the democratic process itself within the union would be severely undermined by court interference with the free choice of the members.

These objections to the preliminary injunction which the government seeks have considerable merit. For the reasons that the Teamsters for Liberty advance, it is not a desirable or healthy thing for the court at the government's request to step in and interfere with the free, unfettered choice of Local 560's members. If only the competence or the judgment or even the simple honesty of the candidates were involved, the court should not interfere with the union membership's choice. Normally, the members should be free to elect incompetent, unwise or even dishonest officials if they choose. They would simply have to live with the consequences of their choice.

However, more than mere competence, wisdom or honesty is involved here. There is involved the question of the renewed subjugation of a major union local to an organized crime group. The consequences of such a development would extend far beyond the membership of Local 560. The public at large is hurt by racketeer domination of a union. Ultimately the public pays a heavy price for labor extortion, sweetheart contracts, the looting of union pension funds.

Because the public pays such a heavy price for racketeer dominated business organizations and racketeer dominated labor unions, Congress enacted the RICO Act and conferred the power and duty upon courts to take appropriate action to end such domination, including the power and duty, if necessary, to remove or prevent the selection of officers and agents of business organizations and labor unions. The public interest in racketeer free corporations and unions overrides the interest of stockholders of corporations or members of unions freely to select their officers.

And so it is in this case. The public's interest in a racketeer free Local 560 overrides the interests of the members, even a large majority of the members, to elect officers who in all likelihood will lead Local 560 back into the control of the Genovese Crime Family. The government is highly likely to establish at a final hearing that the election of Sciarra and Sheridan as President and Vice President will have that very effect.

Balancing the pertinent factors, I conclude that Sciarra and Sheridan should be preliminarily enjoined from running for union office in the forthcoming election. Whether additional relief is required can be determined after the final hearing.

The government is requested to submit an appropriate order.